[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11788
_____

D.C. Docket No. 3:14-cv-00031-TCB


EBONIE BATSON,

Plaintiff - Appellant,

versus

THE SALVATION ARMY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____
(July 31, 2018)

Before ROSENBAUM, JILL PRYOR and RIPPLE,[*] Circuit Judges.

JILL PRYOR, Circuit Judge:

---

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

Ebonie Batson was an employee of The Salvation Army ("TSA") for more than a decade. She received promotions and consistently positive performance reviews. After Batson was diagnosed with Multiple Sclerosis, she requested leave under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and an accommodation under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). TSA then eliminated her position and required her to apply and interview for a position she had previously held. During the interview, Batson was questioned repeatedly about her appointments with doctors and ability to travel. TSA decided against hiring Batson for her former position, citing her conduct in the interview and poor job performance.

Batson filed a complaint against TSA in federal district court, alleging that the organization had discriminated against her based on her disability when it denied her a reasonable accommodation in violation of the ADA, retaliated against her for statutorily protected activities in violation of the ADA and the FMLA, and interfered with her rights under the FMLA. The district court granted TSA's motion for summary judgment on all of Batson's claims. The district court ruled that she failed to come forward with evidence of the following: on her accommodation claim, that TSA had denied her request for a reasonable accommodation; on her retaliation claim, that TSA's explanations for eliminating

2

her position and refusing to rehire her were pretextual; and on her interference claim, that TSA had interfered with her rights under the FMLA.

After careful consideration, and with the benefit of oral argument, we affirm in part and reverse in part the district court's grant of summary judgment. We agree with the district court that Batson failed to establish that TSA discriminated against her by refusing to accommodate her under the ADA. But we disagree that Batson failed to offer evidence showing that TSA's explanations for terminating her were pretextual and that TSA interfered with her rights under the FMLA. Batson is thus entitled to a trial on her ADA and FMLA retaliation claims and her FMLA interference claim.

## I.    BACKGROUND

### A.    Factual Background

Because Batson's claims rely upon who knew and did what when, a chronology of relevant events is necessary. On review of summary judgment, we set forth the facts in the light most favorable to Batson, the non-moving party. *See Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1307 (11th Cir. 2012). In 2002, Batson began working for TSA at the organization's territorial headquarters in Atlanta, Georgia. She was transferred to the Audit Department in 2006 and promoted to Senior Auditor the following year. At that time, Major Len Eugene

3

Broome was the Audit Secretary and head of the Audit Department.[1]  Frank Duracher, the Audit Manager, was Batson's direct supervisor.

Batson was diagnosed with Multiple Sclerosis in January 2010.  She informed her supervisors and the rest of the Audit Department of her diagnosis shortly thereafter.  Around the same time that Batson was diagnosed, Broome became ill and could not fully discharge his duties, which led to a restructuring of the Audit Department.  To assist Broome, TSA promoted Duracher to the position of Assistant Audit Secretary and Batson to the position of Audit Manager.

Broome passed away in September 2012 and was replaced as the Audit Secretary by Major Everett Wilson.  Following Broome's death, Wilson and Duracher discussed whether Batson's position as the Audit Manager remained necessary now that Broome's former position had been filled.  Wilson reassigned some of Batson's duties to himself and Duracher.

Throughout her tenure with TSA, Batson received "excellent performance evaluations."  Doc. 58 at 11.[2]  In her 2009 performance review, Duracher wrote that Batson was a "wonderful employee" who "always ha[d] a pleasant demeanor" and was "eager to learn new auditing techniques."  *Id.*  In Batson's 2011 performance review, Duracher wrote that she was "a pleasure to work with" and

---

[1]  TSA has a military organizational structure; its upper level employees have military titles.

[2] Citations to "Doc. #" refer to the numbered entries on the district court's docket.

4

that she had "grown nicely in her role as [A]udit [M]anager." *Id.* at 12. According to Batson's 2012 performance review, the last one before her termination, she "exceed[ed] expectations" in every category. *Id.* Duracher commented that Batson was "eager to help anyone in need" and that "she strives for excellence and sets an example for the entire department." *Id.*

In November 2012, a couple of months after Wilson assumed the position of Audit Secretary, Batson requested a meeting with Duracher and Wilson to discuss her need for an accommodation because of her Multiple Sclerosis. A meeting was scheduled for December 4, 2012, but it had to be rescheduled. The meeting was rescheduled a number of times between December 2012 and April 2013 but never took place.

In January 2013, Batson requested and took her first FMLA leave, which was approved for a two-week period. Later that month, she requested intermittent FMLA leave, which was also approved.

Batson met with Dr. Murray Flagg, the head of the human resources department for TSA's southern territory on February 22 to discuss Batson's concerns related to her Multiple Sclerosis. In particular, Batson told Flagg that Duracher had disclosed her medical diagnosis to another employee. She later complained about Duracher's disclosure in an official grievance, which led TSA to reprimand him.

Shortly after her meeting with Flagg, in late February, Batson's physician completed an ADA Interactive Process Questionnaire on her behalf. Through that questionnaire, which was submitted to TSA, Batson requested adjustments to her travel schedule and asked to telecommute occasionally due to her illness. Regina Davis, the Assistant Human Resources Director, was aware of Batson's request.

After Batson submitted the questionnaire, she met with Davis and Rendrick Nash, another human resources employee, to discuss her FMLA leave and her supervisors' failure since November of 2012 to meet with her about her request for an accommodation. Davis and Nash told Batson that Wilson and Duracher had denied her accommodation request.

On March 1, Flagg met with Wilson and Duracher to discuss the grievance Batson had filed. The same day, Wilson requested to eliminate Batson's position, explaining that following Broome's death, three administrative leads were no longer necessary "as [Duracher] and I can effectively lead the department." Doc. 57-14 at 1. At the same time, Wilson requested permission to post a vacant Senior Auditor position, the position Batson had held before her promotion to Audit Manager, so that "upon notification that her position . . . is being eliminated, [she] c[ould] apply for consideration as Senior Auditor." *Id.*

Around the same time, TSA's Territorial Finance Council ("TFC") approved the elimination of Batson's Audit Manager position. It also determined that she

6

could be transferred directly to the Senior Auditor position. Captain Phil Swyers, who led the TFC, emailed Davis that there was "no need to post the Senior Auditor position unless Ms. Ebonie Batson does not accept the opportunity to transfer . . . from her present . . . position." Doc. 58-10 at 3. Davis responded, however, that the position had to be posted internally to comply with equal opportunity laws and the organization's affirmative action policy. Swyers replied by reiterating that Davis should follow the TFC's instruction: "I am writing to confirm that the original email below . . . is the procedure TFC would like Major Wilson to follow." *Id*. at 1. Davis again insisted that "TFC [was] instructing us to violate the [affirmative action plan], which is a violation of federal law." *Id.* The record is unclear as to whether such a plan or policy actually existed at TSA and, if so, whether permitting Batson to fill a Senior Auditor position that she had held previously without posting the position would violate that policy.

At the end of March, Batson took approved FMLA leave for several weeks. Before she left, she overheard Wilson say, "[w]e don't allow sick people in our department, everyone has to work." Doc. 64-1 at 15. When she returned from her leave, Wilson and Davis informed her that her Audit Manager position had been eliminated and that she could apply for the Senior Auditor position. Batson was told that the application process was just a formality and that she would be

transferred to her previous role; she merely had to apply. The position was posted internally, and Batson was the only person to apply by the deadline.

While Batson's application was pending, Wilson retired from his position as Audit Secretary and was replaced by Major Beatrice Boalt, who was tasked with filling the Senior Auditor position. Before Wilson's departure, he emailed Boalt, telling her that TSA was "obligated" to hire Batson because "[s]he never receive[d] poor ratings and she did the [Senior Auditor] job prior to the position she held." Doc. 60 at 19. Wilson expressed his belief that Batson could be transferred directly to the Senior Auditor position. He testified in his deposition that she was qualified and that he perceived her to be "bright" and "capable of what she was doing." *Id.* at 17.

TSA nonetheless required Batson to interview for the Senior Auditor position. Before the interview, Boalt emailed Colonel Samuel Henry, the head of the Audit and Financial Department, expressing concern about hiring Batson. Given that Batson was "the only one who applied" by the deadline, Boalt wrote, "[i]t appears that we have painted ourselves into a corner . . . [s]o we have to hire her?" Doc. 54-2 at 1. Boalt revealed that she "had hoped . . . [to] find out if we could appoint [another candidate] as the Senior Auditor." *Id.* at 2. She also worried about the questions she could ask Batson in the interview, telling Henry, "I guess for the interview, I need to be coached as to what I can and can't say." *Id.* at

8

1. Later she emailed a human resources employee to ask whether "there are any questions I cannot ask." Doc. 54-3 at 2. She added, "I assume that if this candidate is applying then the candidate . . . is well enough to travel at least 75% of the time." *Id.*

Together Boalt and Duracher interviewed Batson for the Senior Auditor position. During the interview, Boalt asked Batson a number of questions related to Batson's health, including the following:

- "Traveling as much as we do, we all have times when we need to see a doctor or dentist. Our policy is to take these appointments on either Monday morning or Friday. . . . Is there anything that may hinder your ability to meet these requirements?"

- "[A]ll auditors are expected to be [present] during normal business hours. If time away from the office is needed for doctor/dentist appointments, advance notice should be sent to Frank Duracher with a copy to Major Boalt. This is a new policy that was recently enacted. Do you foresee any challenges with adhering to this new policy?"

- "The travel schedule of the Senior Auditor position is very demanding. . . . Are you able to meet the travel requirements of this position?"

Doc. 58-24 at 3-4. Batson testified that as Boalt continued to ask her questions related to her medical appointments and ability to travel, Duracher repeatedly put his head down. Batson eventually became frustrated; she told her interviewers that she knew federal law and believed they were not permitted to ask about her medical condition.

9

Following the interview, Boalt wrote to Henry that Batson "tried to be professional but was pretty combative." Doc. 58-22 at 1. Duracher testified that during the interview Batson never yelled or raised her voice and that she had answered the questions completely. He could "understand [Batson's] confusion on why she had to go through an interview process." Doc. 58 at 20. But he agreed that Batson was "combative and confrontational," and that "[h]er tone when she answered questions . . . made [him] feel like she was being antagonistic." *Id.* at 20, 21.

Duracher testified that after the interview he had not yet decided whether to recommend that Batson be hired for the Senior Auditor position. Boalt, who was the final decision maker, emailed Henry that she "believe[d] her recommendation [was] not to hire [Batson]," but she "need[ed] to think through the rationale." Doc. 54-7 at 1. Batson was not hired for the position, which remained open.

According to Boalt, "[t]he primary reason for [her] decision was [Batson's] performance in the interview." Doc. 52-3 at 3. She also expressed "concern[]" about Batson's "performance issues as Audit Manager as reported by Duracher." *Id.* In particular, she noted three occasions in 2012 when Batson had submitted a late report. Batson's employment was terminated.

10

## B.    Procedural History

Batson filed an Intake Questionnaire with the Equal Employment Opportunity Commission ("EEOC"), marking boxes for disability and retaliation as the bases for her employment discrimination claims.  With the assistance of an EEOC investigator, she also filed a "Charge of Discrimination," which stated that she had requested a reasonable accommodation, her request had been denied, and she believed she was "discriminated against due to [her] disability."  Doc. 64-3 at 13.  The Charge identified June 4, 2013, the day she was terminated, as the latest date on which discrimination had taken place.

Batson later filed a lawsuit in federal district court alleging claims under the ADA and the FMLA.  TSA moved for summary judgment on all of Batson's claims, and the magistrate judge recommended granting summary judgment on every issue.  Over Batson's objections, the district court adopted the magistrate judge's recommendation and granted summary judgment in favor of TSA.  Batson timely appealed.

## II.    STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court.  *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006).  Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must draw all reasonable inferences in favor of the non-moving party. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1326 (11th Cir. 1998).

## III.    DISCUSSION

Batson's claims arise under the ADA and the FMLA. She contends that in light of her disability TSA (1) denied her a reasonable accommodation in violation of the ADA, (2) retaliated against her for engaging in statutorily protected activity in violation of the ADA and the FMLA, and (3) interfered with her substantive rights in violation of the FMLA. We consider in turn whether the district court erred in granting summary judgment on each of these claims.

## A.    ADA Failure to Accommodate Claim

We first consider Batson's claim that TSA failed to offer her a reasonable accommodation for her disability, in violation of the ADA. The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of employment discrimination under the ADA, a plaintiff must show that at the time of the adverse employment action, she (1) had a disability, (2)

12

was a qualified individual, and (3) was subjected to unlawful discrimination because of her disability. *Holly v. Clairson Indus., L.L.C*., 492 F.3d 1247, 1255-56 (11th Cir. 2007).

One way a plaintiff may establish the third prong is by showing that her employer failed to provide her with a reasonable accommodation for her disability. *Id.* at 1262. The ADA requires an employer to accommodate an employee with a known disability unless the accommodation would result in undue hardship to the employer. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). The parties' dispute centers on whether Batson established the third prong. Like the district court, we conclude that Batson advanced no evidence establishing that TSA failed to accommodate her disability.

Viewing the evidence in Batson's favor, she asked TSA, through an ADA questionnaire completed by her physician, to adjust her travel schedule and allow her to telecommute occasionally. Davis and Nash informed her that her supervisors had denied her request for these accommodations. About a week after Batson learned that her request had been denied, she took FMLA leave. When she returned from leave after six weeks, she was told that her position had been eliminated, and she was terminated shortly afterward. The problem for Batson is that she has offered no evidence that before her FMLA leave and her termination she needed either of the accommodations she previously had requested generally.

13

The record reflects that before Batson's meeting with Davis and Nash, she received all of the time off and adjustments to her schedule that she had requested.

We agree with Batson that the record establishes TSA's intent to deny her accommodation, but without evidence of a specific instance in which she needed an accommodation and was denied one, she cannot establish a failure to accommodate. Batson concedes that she was never denied a specific accommodation she requested, but she argues that because of the timing of her FMLA leave and subsequent termination, TSA had no opportunity to deny any specific individual requests. Batson offers no authority, however, supporting that in the absence of a specific request and denial, an employee may establish a discrimination claim based on the employer's intent to withhold an accommodation. The district court found, and Batson does not dispute, that she "was never actually denied any request for accommodation." Doc. 74 at 30. Absent such a denial, there can be no failure to accommodate under the ADA.

## B.    FMLA and ADA Retaliation Claims

Batson argues that TSA retaliated against her in violation of the FMLA and the ADA by refusing to rehire her for her previous position. Because the FMLA and ADA retaliation claims require similar legal analysis and depend upon the same set of facts, we address them together.

### 1.    Administrative Exhaustion of ADA Retaliation Claim

Before reaching the substance of Batson's claims, we must determine whether Batson exhausted her administrative remedies such that she could raise her ADA retaliation claim in federal court.[3]  The district court decided that Batson failed to exhaust her administrative remedies on her ADA retaliation claim because the Charge of Discrimination she filed with the EEOC included allegations only about TSA's failure to provide a reasonable accommodation under the ADA.  We disagree.

An employee making a discrimination claim under the ADA must first exhaust her administrative remedies by filing a Charge of Discrimination with the EEOC.  *Maynard v. Pneumatic Prods. Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001).  The purpose of this requirement is to allow the EEOC the "first opportunity to investigate the alleged discriminatory practices [and] perform its role in obtaining voluntary compliance and promoting conciliation efforts."  *Gregory v. Ga. Dept. of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (internal quotation marks omitted) (explaining exhaustion in the Title VII context).  With this purpose in mind, "[t]his Court . . . has noted that judicial claims are allowed if they amplify,

---

[3] Whether Batson exhausted her administrative remedies impacts only her ADA retaliation claim.  There is no dispute that Batson exhausted her remedies on her denial of accommodation claim, which we addressed above.  The FMLA has no exhaustion requirement. *See* 29 C.F.R. § 825.400 (2017) ("The employee has the choice of . . . [f]iling . . . a complaint with the Secretary of Labor, or . . . [f]iling a private lawsuit.").

15

clarify, or more clearly focus the allegations in the EEOC complaint, but has cautioned that allegations of new acts of discrimination are inappropriate." *Id.* at 1279-80 (internal quotation marks omitted).

At the same time, though, we have been "extremely reluctant to allow procedural technicalities to bar claims brought under [discrimination statutes]." *Id.* at 1280 (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460-61 (5th Cir. 1970)).[4]  To that end, we have noted that "the scope of an EEOC complaint should not be strictly interpreted." *Id.* (quoting *Sanchez*, 431 F.2d at 465).  In *Gregory*, for example, we held that although the plaintiff had not checked the retaliation box on the document she filed with the EEOC, "the exhaustion requirement was nonetheless satisfied" because the EEOC's "investigation . . . would have reasonably uncovered any evidence of retaliation." *Id.* at 1278.  To determine whether a plaintiff has exhausted her administrative remedies, then, the "proper inquiry" is whether the "[plaintiff's] complaint [is] like or related to, or grew out of, the allegations contained in [the] EEOC charge." *Id.* at 1280.

Batson exhausted her administrative remedies because she included in the Charge facts supporting her ADA accommodation claim that are "like or related to" the ADA retaliation claim she alleged in federal district court. *Id.*  In the

---

[4] Decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

16

Charge, Batson stated that she believed she suffered discrimination because of her disability, that she had requested an accommodation in February 2013, and that her request was denied. The Charge also listed Batson's termination date as the last day on which discrimination had taken place.

Even though Batson did not mark the retaliation box on the form, as in *Gregory* the information included in the Charge was sufficiently "related to" Batson's retaliation claim to satisfy the exhaustion requirement. Batson argues that her ADA failure to accommodate claim is inextricably linked to her ADA retaliation claim, because her accommodation request was the basis for TSA's retaliation against her, and her termination, mentioned in the Charge, was the specific form the retaliation took. Given this link, an EEOC investigation of Batson's failure to accommodate claim would have "at least in some fashion" uncovered Batson's retaliation claim. *Id.* We thus conclude that Batson's Charge, "prepared without the assistance of counsel, and under the liberal EEOC charge strictures," was sufficient to exhaust Batson's remedies with respect to her ADA retaliation claim.[5] *Id.*

---

[5] Because the Charge itself was sufficient to exhaust Batson's administrative remedies as to her ADA retaliation claim, we need not address whether the Intake Questionnaire she submitted to the EEOC, which clearly identified retaliation as one of her claims, should also be considered.

17

## 2.     Merits of Retaliation Claims

In addition to prohibiting discrimination "because of an individual's disability," which we discussed above, the ADA also includes "an express antiretaliation provision." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 357 (2013) (alterations adopted) (internal quotation marks omitted). The ADA's antiretaliation provision prohibits "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful [by the Act] or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

The FMLA provides eligible employees the right to 12 weeks of "leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1)(D). The Act further establishes the employee's right to be restored to the position she held when her leave commenced, or an equivalent position. *Id.* § 2614(a)(1)(A)-(B); *Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1267 (11th Cir. 2008). Like the ADA, the FMLA protects the substantive rights it creates by prohibiting an employer from retaliating against its employee for engaging in activities protected under the Act. 29 U.S.C. § 2615(a)(1)-(2); *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001).

18

Where, as here, an employee alleges retaliation under the FMLA or the ADA without direct evidence of the employer's intent, we apply the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Martin*, 543 F.3d at 1268 (FMLA); *Standard*, 161 F.3d at 1331 (ADA). To establish a prima facie case of retaliation under either act, an employee must demonstrate (1) that she engaged in statutorily protected conduct, (2) that she suffered an adverse employment action, and (3) that a causal connection exists between the two. *Hurlbert*, 439 F.3d at 1297; *Standard*, 161 F.3d at 1328. Once the employee has established a prima facie case, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse action. *Hurlbert*, 439 F.3d at 1297; *Standard*, 161 F.3d at 1331. If the employer does so, the burden shifts back to the employee to demonstrate that the "employer's proffered reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Martin*, 543 F.3d at 1268 (internal quotation marks omitted).

TSA does not challenge the district court's determination that Batson established a prima facie case of retaliation under the FMLA and the ADA. There is also no dispute that TSA offered a nondiscriminatory explanation for failing to hire Batson for the Senior Auditor position. Our task, therefore, is to determine

19

whether Batson successfully rebutted TSA's reasoning such that a reasonable juror could find that its explanation was pretextual.

Boalt, the decisionmaker, offered two reasons for rejecting Batson for the Senior Auditor position. First, she identified as "the primary reason" for her decision that Batson performed poorly in the interview. Doc. 52-3 at 3. Her second reason was concern about Batson's "recent performance issues" as the Audit Manager, "as reported by Duracher." *Id.* Batson offered ample evidence suggesting these explanations were pretextual, which we summarize below.

The first reason is called into question by the fact that *before* Batson's interview Boalt indicated that she did not want to hire Batson. Boalt wrote in an email to Henry that "[i]t appears we have painted ourselves into a corner" because "Ebonie [was] the only one who applied by 10:00 a.m. on Friday morning," the application deadline. Doc. 54-2 at 1. Boalt recalled that she had "hoped to meet with [Henry] and find out if we could appoint [another candidate]," asking Henry, "[s]o we have to hire her?" *Id.* at 1-2. Based on this email, a reasonable jury could disbelieve Boalt's explanation that the primary reason she chose not to hire Batson was Batson's interview performance, which had not yet occurred when the email was sent.

Boalt also expressed concern about Batson's health before the interview, further suggesting that she was worried about hiring Batson for reasons unrelated

20

to Batson's interview performance.  In her email to Henry, Boalt wrote, "I guess for the interview, I need to be coached as to what I can say and can't say." *Id.*  In another email to a human resources employee sent the following day, Boalt asked whether "there [were] any questions [she could not] ask" Batson during the interview, noting her "assum[ption] that if this candidate is applying then [she] . . . is well enough to travel at least 75% of the time."  Doc. 54-3 at 2.  A jury reasonably could infer from Boalt's concern about whether Batson was "well enough" that Batson's disability or her need for FMLA leave caused Boalt to reject her.

During Batson's interview, at which Boalt and Duracher were present, Boalt repeatedly asked Batson questions about her health and its impact on her ability to meet the demands of the job.  Boalt asked Batson whether she would be able to give advance notice when she had a doctor's appointment and whether she could meet the position's "very demanding" travel requirements.  Doc. 58-24 at 4.  Batson replied that she could "stick with [her] schedule," as she had "for the past seven years with minor requests here and there."  Doc. 64-2 at 4.  After Boalt asked a third question related to Batson's medical condition, Batson said that she understood federal law and believed she could not be questioned about her illness.  Boalt's multiple questions about Batson's doctor's appointments and ability to travel—particularly in combination with Boalt's prior emails—could support a

21

finding that Boalt was concerned about Batson's disability and her need for FMLA leave, not her interview performance.

Further, although Duracher to some extent corroborated Boalt's testimony that Batson was combative during the interview, there is conflicting evidence about Batson's interview performance.  Batson testified that she was "not loud or argumentative"; rather, she "was quiet and hurt because she felt like she was being interrogated about [her] medical condition."  *Id.*  She observed that every time Boalt questioned her related to her health, Duracher put his head down.  Duracher testified that Batson never raised her voice or yelled and that she answered the questions satisfactorily.  He also testified that he understood Batson's confusion and frustration in having to interview for a position she had previously held.  A reasonable jury could infer from these contrasting descriptions of the interview that Boalt's asserted failure to hire Batson based on her interview performance was pretextual.

There was also evidence specifically undermining Boalt's second explanation, that she decided not to hire Batson because of performance issues, including missing deadlines for turning in reports.  Boalt—who had no experience supervising Batson—maintained that Batson's performance issues were "reported by Duracher," yet Duracher testified that Batson's performance evaluations historically were excellent and that she had received the highest level ranking the

22

majority of the time.  Doc. 52-3 at 3.  Indeed, in Batson's last review before her employment was terminated, Duracher wrote that she "strives for excellence and sets an example for the entire department."  Doc. 58 at 12.  And although Duracher acknowledged that Batson had missed three deadlines in 2012 while she was the Audit Manager, those issues had not concerned him enough to give her a verbal warning.  He did not recall Batson missing any deadlines as a Senior Auditor, but added that even if she had, "we all miss deadlines from time to time."  *Id*. at 27. Wilson, who was Duracher's supervisor and had signed Batson's performance reviews, also thought highly of Batson's job performance.  Wilson testified that Batson was "bright" and "capable."  Doc. 60 at 17.  Before he retired, Wilson emailed Boalt, telling her that Batson should be hired for the Senior Auditor position because "[s]he never receive[d] poor ratings and she did the job prior to the position she held."  *Id.* at 19.  Batson's supervisors' positive views of her performance and her historically "excellent" reviews support that Boalt's concerns about Batson's performance were pretextual.  *Cf. Kragor*, 702 F.3d at 1309-11 (holding that summary judgment on employee's age discrimination claim was inappropriate where employer had testified she was "exceptional" and that "she had done nothing wrong" after firing her for violating a company policy).

Lastly, undermining both of Boalt's explanations, following the interview, Boalt sent Henry an email stating that Batson had been "pretty combative" and that

Boalt was inclined to recommend against hiring her, but "need[ed] to think through the rationale." Doc. 54-7 at 1. The district court interpreted this statement to mean that Boalt simply needed to give more thought to the decision, but it could also be interpreted to mean that Boalt decided not to hire Batson because of her illness but recognized the need to come up with an alternative justification. Particularly in light of Boalt's expression of concern about hiring Batson prior to the interview, we disagree with the district court's view that this statement necessarily is inconsistent with a discriminatory motive.

Viewing all of this evidence in Batson's favor—including, among other things, Boalt's statements before the interview that she felt "corner[ed]" into hiring Batson, her questions about whether Batson was "well enough" to travel, her concern expressed in the interview questions about Batson's doctor's appointments, and Duracher's contrary testimony about Batson's interview and job performance—a reasonable jury could infer that Boalt decided against hiring Batson because of Batson's illness, not because of her interview or job performance, and that Boalt's explanations to the contrary were pretextual. To be sure, Batson has not proven that TSA's reasons *were* pretextual, nor must she at this stage. At summary judgment, Batson need only "cast sufficient doubt" such that a jury could infer that TSA's "proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519,

24

1538 (11th Cir. 1997) (internal quotation marks omitted).  Batson has carried that burden here, and thus her FMLA and ADA retaliation claims should proceed to trial.

### C.    FMLA Interference Claim

Batson also claims that TSA violated the FMLA by interfering with her substantive rights under the Act, specifically, her right to be restored to the same or an equivalent position following her use of FMLA leave.  *See* 29 U.S.C. § 2614(a)(1)(A)-(B); *Martin*, 543 F.3d at 1267.  Unlike with an FMLA retaliation claim, to succeed on an FMLA interference claim an employee need only demonstrate by a preponderance of the evidence that she was entitled to an FMLA benefit that was denied.  *Strickland*, 239 F.3d at 1206-07.  In general, "the employer's motives are irrelevant" to an interference claim.  *Id.* at 1208.  Where the claim is based on an employee's termination, however, as Batson's claim is here, an employer may affirmatively defend against the claim by establishing that it would have terminated the employee regardless of her request for or use of FMLA leave.  *Martin*, 543 F.3d at 1267 (citing 29 U.S.C. 2614(a)(3)).

At summary judgment, then, the analyses for an FMLA interference claim based on an employee's termination and an FMLA retaliation claim are essentially the same:  we ask whether the evidence, viewed in the light most favorable to the

25

non-moving party, establishes as a matter of law that the employer would have terminated the employee regardless of her request for or use of FMLA leave.[6] Because Batson raises evidence from which a reasonable jury could conclude that TSA's proffered explanations for terminating Batson were pretextual, she likewise raises a genuine dispute of material fact as to whether she would have been terminated regardless of her request for FMLA leave.

## IV.    CONCLUSION

The district court correctly determined that Batson's ADA failure to accommodate claim fails as a matter of law, and we affirm the district court's order granting summary judgment to TSA on that claim.  The district court erred, however, in determining that Batson failed to present evidence sufficient to avoid summary judgment on her FMLA and ADA retaliation claims and on her FMLA interference claim.  Accordingly, we reverse the district court's order granting summary judgment to TSA on Batson's ADA and FMLA retaliation claims and on her FMLA interference claim, and the case is remanded for further proceedings consistent with this opinion.

**AFFIRMED IN PART**; **REVERSED AND REMANDED IN PART.**

---

[6] Although the analyses for an FMLA retaliation claim and an FMLA interference claim merge at the summary judgment stage, at trial, it remains the employer's burden to establish its affirmative defense by showing that it did not interfere with its employee's substantive rights under the FMLA by terminating the employee. *See Parris v. Miami Herald Pub. Co.*, 216 F.3d 1298, 1301 n.1 (11th Cir. 2000) ("At trial, the [employer] must prove that its decision [to terminate the employee] was unrelated to [the employee's] FMLA-protected sick leave.").