[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14863
Non-Argument Calendar

_____

D.C. Docket No. 2:17-cv-00225-ALB-SMD

TIFFANY HUGHES,

Plaintiff-Appellant,

versus

WAL-MART STORES EAST, LP,
MICHAEL R. HARRIS,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(February 24, 2021)

Before JORDAN, ROSENBAUM, and BRANCH, Circuit Judges.

PER CURIAM:

Tiffany Hughes appeals from the district court's order granting Walmart Stores and Michael Harris summary judgment in her action, in which she asserted that the defendants—her former employers—had retaliated against her in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, and defamed her in violation of Alabama law.  As to her retaliation claim, she argues that the district court erred in granting summary judgment because she established a causal connection between several attempts to receive an accommodation for her disability and her eventual suspension and termination.  As to her defamation claim, she argues that the district court erred in granting summary judgment because the allegedly defamatory statement that she was "unfit" to continue working at a Walmart pharmacy on July 6, 2016, was not a mere opinion.

For reasons explained further below, we conclude that the district court did not err in granting summary judgment on Mrs. Hughes' retaliation and defamation claims. We therefore affirm.

I

Mrs. Hughes has been diagnosed with several medical disorders which limit her fine motor skills and ability to stand for long periods of time. *See* D.E. 85-15 at 2. These ailments include Lupus, Ehlers Danlos Syndrome (hypermobility syndrome), joint subluxation, muscle spasms, rheumatoid arthritis, degenerative disk disease, unclassified connective tissue disorder, and fibromyalgia. *See id*. Mrs.

2

Hughes first made her supervisor, Mr. Harris, aware of these conditions during a conversation with him in February of 2015 about her potential inability to comply with a new Walmart policy requiring certification to deliver injections by syringe due to her medical disabilities. Mrs. Hughes alleges that this disclosure was the first domino in a series of protected activities followed by retaliation which has led to the current suit. *See* Appellant's Brief at 4.

The second domino to fall, according to Mrs. Hughes, occurred four months later when Mr. Harris gave her a "heads up" that she might lose her benefits because she had been incorrectly categorized as a full-time employee. *See id.* In July, Mrs. Hughes complained to Mr. Harris' supervisor, Mr. Souers, who confirmed that she needed more hours to retain her benefits. *See id.* at 5. Ms. Harris ultimately was recategorized as part time and lost a "substantial array" of benefits. *See id*.

The next wave of dominos was set in motion in August of 2015, when Mrs. Hughes complained to Mr. Harris about her change in employment status. *See id*. Mr. Harris subsequently emailed Mr. Azarello, Mrs. Hughes' pharmacy manager, directing him to remove a stool which had been in the pharmacy for years and was frequently used by the employees, including Mrs. Hughes. *See id*. Mrs. Hughes asked Mr. Harris to reconsider and keep the stool because it helped her manage the pain from her medical conditions. *See id*. Despite having the authority to allow "job aids," Mr. Harris declined to accommodate the request and directed Mrs. Hughes to

make a formal request with Walmart for reasonable accommodation under the ADA. *See id*. at 4–5.

Mrs. Hughes submitted a formal request for a stool on October 16, 2015. Despite her request being approved on November 5, an OSHA—approved stool wasn't ordered until February of 2016, although she was allowed to use the other stool. *See id.* at 6–7. In response to this delay, Mrs. Hughes lodged a complaint of discrimination with Walmart's Global Ethics Hotline against Mr. Harris. *See id.* at 6. Mr. Harris became aware of the complaint and subsequently ordered another employee, Mr. Azarello, to write up Mrs. Hughes for failing to properly complete a hazardous waste label. *See id*. Despite Mr. Azarello admitting that he had prematurely placed the label, he received no discipline while Mrs. Hughes was written up, resulting in an elevation of her discipline status and paid remedial training. *See id.* at 7.

On January 7, 2016, Mrs. Hughes filed a charge of discrimination and retaliation with the Equal Opportunity Employment Commission, which Mr. Harris and Souers both learned of. *See id.* at 7–8. This was followed by a four-month respite until, on May 17, 2016, Walmart Compliance contacted Mrs. Hughes to alert her that she had yet to compete the conflict of interest form required of all pharmacy employees. *See id.* at 8. Mrs. Hughes expressed reservations about her ability to accurately complete the form and on May 25 was told by a Walmart Compliance

representative, Ms. McCool, that she would consult with her team and get back to Mrs. Hughes with additional instructions. *See id*. Unfortunately, such guidance never arrived, and Mrs. Hughes never heard from Ms. McCool again. *See id*.  Mr. Harris and Souers were aware of Mrs. Hughes' lack of compliance and exchanged several emails with Walmart Compliance before ultimately being told on June 23 that "until guidance is provided, no employment action related to the COI survey can be taken against Hughes." *See id.* at 9.

The next confrontation occurred one week later when Mr. Harris and Souers decided to tour Store #483, the Walmart store at which Mrs. Hughes worked, and on a day she was scheduled to work. Apparently having noticed Mrs. Hughes' open-toed shoes during the tour, Mr. Harris texted Mrs. Hughes the morning of her next scheduled day of work and instructed her to wear close-toed shoes in compliance with his interpretation of the Walmart dress code policy.  *See id.* at 11. Despite having worn open-toed shoes in the pharmacy for years, Mrs. Hughes complied and changed into her husband's dress shoes. *See id.* Unfortunately, however, the saga did not end there, and Mr. Harris and Mrs. Hughes had a series of three escalating confrontations over the dress code and conflict of interest form. *See id.* at 11–14. The last confrontation ended with Mr. Harris telling Mrs. Hughes that she was "unfit, "no longer in a frame of mind to safely fill prescriptions that day," and "was going

to be relieved of her duties for the day so that she could get into a better frame of mind." *Id.* at 13–14.

Walmart subsequently suspended Mrs. Hughes and conditioned her reinstatement on completion and return of the conflict of interest form before July 31. *See id.* at 15. Walmart later added that Mrs. Hughes had to meet with Mr. Harris or another member of leadership before returning to work or could find another position in a different market. *See id.* at 15–16. Walmart formally terminated Mrs. Hughes on September 26, 2016. Mrs. Hughes sued, resulting in the present case.

## II

We review a district court's order granting summary judgment *de novo*, "viewing all evidence, and drawing all reasonable inferences, in favor of the non-moving party." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005). A party is entitled to summary judgment if it can show "that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A district court, like this Court, must view the evidence in the light most favorable to the non-moving party. *See Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1207 (11th Cir. 2018).

## III

Title I of the ADA prohibits discrimination against an individual on the basis that the individual "opposed any act or practice made unlawful by [the ADA]" or

"made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" conducted under the statute. 42 U.S.C. § 12203(a). We assess ADA retaliation claims under the same framework as retaliation claims under Title VII. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998). Thus, when a plaintiff alleges retaliation under the ADA without direct evidence of the employer's retaliatory intent, we apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Batson v. Salvation Army*, 897 F.3d 1320, 1328–29 (11th Cir. 2018).

Under this framework, the plaintiff has the initial burden to establish a *prima facie* case of retaliation, and once she does, "the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse action." *Id.* at 1329. "If the employer does so, the burden shifts back to the employee to demonstrate that the employer's proffered reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id.* (quotations marks omitted).

To establish a *prima facie* case of retaliation, the plaintiff must show that (1) she engaged in a statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was a causal connection between the two. *See id.* at 1328. To establish the first element, "it is sufficient that an employee have a good

faith, objectively reasonable belief that [her] activity is protected by the [ADA]." *Standard*, 161 F.3d at 1328. An employee participates in a protected activity when she makes "a request for a reasonable accommodation." *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016).

As to the causal connection requirement, a plaintiff need only demonstrate "that the protected activity and the adverse action were not *wholly unrelated*." *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003) (quotation marks omitted, and emphasis in original). One way that a plaintiff can do so is by providing sufficient evidence that a decision-maker was aware of the protected activity, and that there was a close temporal proximity between this awareness and the adverse action. *See id.* Absent any other evidence tending to show causation, a claim of retaliation fails as a matter of law "[i]f there is a substantial delay between the protected expression and the adverse action." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

We have determined that a time interval of three to four months between the protected activity and termination is too attenuated, as a matter of law, to satisfy the causation element of a retaliation claim. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Regardless, the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action." *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

8

Mrs. Hughes cannot rely on temporal proximity to create a jury issue on causation because nearly six months passed between her EEOC complaint on January 7, 2016, and the alleged retaliatory action—her suspension—on July 6, 2016. There was no other protected activity between January and July to show or permit a finding of causation.

Temporal proximity, however, is not the only way to prove causation, and Mrs. Hughes argues that a pattern of protected activity followed by retaliation establishes the causation element. *See* Appellant's Brief at 37–38; *Goldsmith v. Bagby Elevator Company, Inc.*, 513 F.3d 1261, 1277–78 (11th Cir. 2008). The problem with this theory of causation is that the retaliation she points to falls short of the second element of a prima facie case of retaliation.  In the context of Title VII, the Supreme Court has held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted).  Nonetheless, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

As the district court pointed out, Mrs. Hughes cannot point to any retaliation that does not hinge on the application of a workplace rule that applies to all. *See* D.E. 100 at 13. This includes the initial denial of the request for a stool and subsequent delay, as well as other sanctions for the mislabeling of waste containers, dress code violations, and insubordination. *See* Appellant's Brief at 13–21. Although Mrs. Hughes argues that each rule was unfairly or wrongly applied to her, the uneven application and minimal consequences pled does not rise above the "petty slights and minor annoyances that often take place at work." *See Burlington*, 548 U.S. at 68. A pattern of the enforcement of universally applicable rules is insufficient to show that Walmart's proffered reasoning for her firing—her insubordination—was pretextual and therefore fails to establish a *prima facie* case of discrimination. *See* D.E. 100 at 14. [1]

In sum, the district court did not err in granting the defendants' summary judgement motion as to the retaliation claim because Mrs. Hughes failed to establish a causal connection between any protected activity and an adverse action. Accordingly, we affirm as to the retaliation claim.

---

[1] The defendants also argue that the mislabeling of the waste container incident cannot be considered because it was forfeited when Mrs. Hughes failed to exhaust her administrative by not including it in her EEOC complaint. *See* Appellee's Brief at 28–29. Although we do not need address this argument, we have considered the incident as part of the theory of causation based on a pattern of retaliation.

**IV**

To establish a *prima facie* case of defamation under Alabama law, a plaintiff must show that "[1] that the defendant was at least negligent [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable *per se*) or actionable upon allegations and proof of special harm (actionable *per quod*)." *Ex parte Crawford Broad. Co.*, 904 So. 2d 221, 225 (Ala. 2004) (alteration in original).

The district court granted summary judgment against Mrs. Hughes, concluding that Mr. Harris' statements—describing Mrs. Hughes as "unfit" and "no longer in a frame of mind to safely fill prescriptions that day," and saying that she "was going to be relieved of her duties for the day so that she could get into a better frame of mind"—were statements of opinion accompanied by disclosed facts and so could not constitute defamation. *See* D.E. 100 at 15–17; *Sanders v. Smitherman*, 776 So. 2d 68, 74 (Ala. 2000).

Mrs. Hughes makes a strong argument that the district court may have erred in finding that Mr. Harris' statements were accompanied by disclosed facts and so should not fall under the opinion exception. *See Sanders,* 776 So. 2d at 74. It strikes us as unlikely, and at a minimum a factual question, whether a bystander overhearing these statements would be aware of the contextualizing nondefamatory facts the district court relied on—that Mrs. Hughes had failed to complete a COI form, refused

11

to leave the pharmacy, and raised her voice so that people could hear the argument. *See* D.E. 100 at 17.

Although we do not necessarily agree with the district court as to the presence of disclosed facts, we agree with the defendants that the claim alleges defamation *per quod* without any special damages being proved, and that this deficiency is sufficient to grant summary judgment. *See* Appellee's Brief at 23–24. Slander *per quod* is "slander founded on oral malicious defamation subjecting the plaintiff to disgrace, ridicule, odium, or contempt," and requires a plaintiff to allege and prove special damages. *See Delta Health Group, Inc. v. Stafford*, 887 So. 2d 887, 896-97 (Ala. 2004). Viewing the well-pled facts in the light most favorable to Mrs. Hughes, the alleged defamatory statement would not be slander *per se* under Alabama law, and Mrs. Hughes has made no showing of special damages to support a slander *per quod* claim. *See Hayes v. Wal-Mart* Stores, 953 F. Supp. 1334, 1343 (M.D. Ala. 1996). The district court did not err in granting summary judgment on the defamation claim because Mrs. Hughes failed to present the required evidence of special damages.

## V

We affirm the district court's grant of summary judgment in favor of defendants on both the ADA retaliation and defamation claims.

**AFFIRMED.**

12