[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13149
Non-Argument Calendar

_____

D.C. Docket No. 1:17-cv-23314-UU

KAREN SHANNON,

Plaintiff-Appellant,

versus

NATIONAL RAILROAD PASSENGER CORPORATION,
d.b.a. AMTRAK,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 20, 2019)

Before TJOFLAT, JORDAN and HULL, Circuit Judges.

PER CURIAM:

Plaintiff Karen Shannon appeals the grant of summary judgment to her former employer, National Railroad Passenger Company, d/b/a Amtrak ("Amtrak"), on her claims alleging violations of 42 U.S.C. § 1981 and the Family Leave Act ("FMLA"), 29 U.S.C. §§ 2601 and 2615(a).  After careful review of the record and the parties' briefs, we affirm.

## I.  BACKGROUND FACTS

Shannon's claims include both claims for wrongful termination and failure to hire for other Amtrak positions.  We outline Shannon's work history.

## A.    2013 Amtrak Reorganization and Route Director Position

For 28 years, plaintiff Shannon, who is black, worked for Amtrak before she was terminated during a 2017 company restructuring that eliminated all seven Route Director positions, including Shannon's Route Director position.

Over the course of Shannon's employment, Amtrak underwent eight corporate reorganizations.  When a 2013 restructuring eliminated Shannon's position as an Assistant Superintendent of Passenger Services, Shannon applied for, and obtained, a new position as Route Director of Silver Service in Miami. The Route Director position was in Amtrak's long distance business line. Shannon's new Route Director position was a promotion, and Shannon described

2

the Silver Service route as "the largest and most difficult territory."[1]  In her Route Director position, Shannon's direct supervisor was Tom Kirk, Deputy General Manager, and Kirk's supervisor was Mark Murphy, General Manager of Long Distance Services.

## B.    2014 Application for Crew Base Manager Position in Miami

In 2014, Shannon sought to step down from her Route Director position into the position of Crew Base Manager, a lower-level position that she had held previously.  Shannon was not selected to be interviewed for the position. Ultimately, Georgia DaCosta, who is black, was hired into the Crew Base Manager position.  During her employment, Shannon received multiple promotions and employee awards.  Shannon also was the subject of 19 internal ethics complaints, but none resulted in discipline.  In her December 2014 performance evaluation, Shannon's supervisor Kirk reviewed Shannon positively, stating that she had "performed at an extremely high level" and gave her the highest overall rating of "materially exceeded commitments" for that year.

---

[1]Because Shannon's prior salary was not within the target market salary range, she was placed on a progressive salary plan, pursuant to Amtrak policy, to bring her salary up to the target market over time.

## C.    2015 Requests for Intermittent FMLA Leave

Beginning in June 2015, due to a leg injury that would not heal, Shannon requested and was granted FMLA leave, which she used intermittently.[2]  From November 2015 to May 2016, Shannon was also permitted to work a reduced schedule and to telework three days per week.  Kirk, as Shannon's supervisor, was aware of her FMLA leave.  Mark Murphy, as Kirk's supervisor, also was informed of Shannon's FMLA leave.

## D.    2015 Investigation and Performance Review

Later in 2015, members of Amtrak's human resources department investigated internal complaints, including a petition signed by numerous union employees, that Shannon and Kirk were promoting people unfairly and giving some employees preferential treatment, but the investigation found no wrongdoing. At her December 2015 performance review, Kirk, still as Shannon's supervisor, gave Shannon an overall "met commitments" rating.  This was below her prior "materially exceeded commitments" rating and also below even an "exceeded commitments" rating.

---

[2]Shannon initially was granted FMLA from July 8 to July 30, 2015, and later Amtrak granted her intermittent leave until September 16, 2015.  Amtrak also granted Shannon's subsequent requests for intermittent FMLA leave from November 2015 through May 1, 2016, and from March to August 2017.  In her deposition, Shannon agreed that Amtrak approved all of her FMLA leave requests in 2015.

4

After the 2015 investigation and performance review, Shannon was matched with a female mentor, Ghada Ijam, Amtrak's Senior Vice President of Information Technology, to help Shannon better negotiate corporate politics and develop relationships and leadership skills to succeed in her career. Shannon later declined to be mentored by Ijam, who was from Iraq, because Shannon (1) did not believe Ijam understood Shannon's role in operations and (2) wanted a mentor who was a woman of color.

## E.    DaCosta's 2016 PIP and the Crew Base Manager Position

In May 2016, Shannon placed Georgia DaCosta on a performance improvement plan ("PIP") due to DaCosta's poor work performance. DaCosta complained that Shannon was unfair and biased in administering the PIP because Shannon wanted the Crew Base Manager position that DaCosta held. Although Kirk, Shannon's supervisor, did not believe Shannon had acted inappropriately in handling DaCosta's PIP, he knew that Shannon had expressed interest in DaCosta's job and decided to take over supervision of DaCosta's PIP to avoid the perception of bias.

In June 2016, Kirk terminated DaCosta because she could not meet the goals of her PIP. In August 2016, Shannon applied and was interviewed for the now-vacant Crew Base Manager position in Miami. Shortly thereafter, Mark Murphy, Kirk's supervisor, decided not to fill the position because, by that time, Amtrak

5

was in the process of reviewing all positions and the CEO had "technically abolished" all vacancies. That Crew Base Manager position remained unfilled.

## F.    September 2016 Meeting with Murphy

In September 2016, Murphy met with Shannon and Kirk to talk about Shannon's most recent performance review, in which Kirk had given her an overall rating of only "met commitments." Murphy told Shannon that she had "checked out" during that year. Murphy knew that Shannon had recently applied for the Crew Base Manager position, a position two levels below her current Route Director position. Murphy said that this "sent a very clear signal to [him] that [Shannon] was not necessarily interested in her current position."

Murphy advised Shannon that he was considering consolidating her Route Director position with another vacant Route Director position for efficiency reasons. Murphy also discussed with Shannon the possibility of creating a new position for her reporting directly to him, in which she could use her skills in analyzing food and beverage and customer service. However, Murphy did not have the opportunity to consolidate the two Route Director positions or create a new position for Shannon before Amtrak faced its next reorganization, and then Murphy was no longer responsible for operations.

### G.    Kirk Learns of Shannon's Unprofessional Conduct

Between late 2016 and early 2017, but after Kirk completed Shannon's 2016 performance review, Kirk learned that Shannon had engaged in conduct that he found unacceptable and made him question Shannon's integrity and commitment to Amtrak's core values.  Specifically, Kirk learned that Shannon had permitted employees to surreptitiously listen in on either confidential calls Kirk had had with Shannon about sensitive employee matters or conference calls meant only for management about the upcoming 2017 reorganization.  Shannon also had obtained a confidential draft organizational chart relating to the 2017 reorganization.  Shannon has not disputed that she committed this conduct.

### H.    2017 Reorganization

In January 2017, Amtrak's new CEO decided to undertake another reorganization to restructure Amtrak's three business lines into four regions.  The reorganization eliminated all seven Route Director positions and created a new Passenger Experience Department supervised by Vice President Thomas Hall.  Within the new Passenger Experience Department were eight new positions: (1) a Senior Director of On-Board Service ("OBS"); (2) four regional Directors of OBS (Southeast, Central, East, and West); and (3) three Senior Managers of OBS (Miami, New York, and Oakland).  Vice President Hall, in consultation with Amtrak's human resources department, decided the seven Route Director

7

management positions in the long distance business line could not be transferred over and instead had to be eliminated because the responsibilities of the new management positions in the Passenger Experience Department were substantially different.

On January 13, 2017, Vice President Hall and Murphy held a conference call to discuss the reorganization with the Route Directors.  Shortly thereafter, on February 14, 2017, Shannon applied again for intermittent FMLA leave, including absences of one to two days per two-week period as needed for flare-ups and for medical treatment, and a reduced, 8-hour work day, which was approved through August 14, 2017, or for six months.

On March 8, 2017, Hall sent the Route Directors, including Shannon, formal "impact letters" advising them that their positions were being eliminated as part of the reorganization.  Hall's letter invited Shannon to apply for the new positions in the Passenger Experience Department or other positions within Amtrak.  The letter informed Shannon that Amtrak expected to complete the transition by April 2017, and that if she did not secure another position within the company by that time, her employment would be terminated.

In late March 2017, Vice President Hall hired DeQuincy McRea, who is black, to be the new Senior Director of OBS in the Passenger Experience Department.  McRea then was tasked with hiring the four OBS Regional Directors

8

and three OBS Senior Managers who would work underneath him.  Hall said that

he gave McRea discretion to put together a management team with which McRea

was comfortable, and Hall approved all of McRea's hiring decisions.

## I.    Shannon's Applications for New OBS Positions in the New Passenger Experience Department

Shannon applied for six of the seven new OBS management positions.[3]

Senior Director of OBS McRea interviewed all the candidates for these OBS

positions, including Shannon, and did not select Shannon for any of them.  Instead,

between April 20 and April 21, 2017, McRea extended offers for the four Regional

Director positions to: (1) Anella Popo, a former Route Director who was black, for

the Southeast Region;[4] (2) Cynthia Winslow, a former Route Director who was

white, for the East Region;[5] (3) Jonathan Lombardi, a former Route Director who

was white, for the Central Region[6]; and (4) Todd Traynor-Corey, an outside

applicant who was white, for the West Region.[7]

---

[3]Shannon did not apply for the Senior Manager position in Oakland.

[4]Popo had 22 years of Amtrak experience, including 4 years as Route Director, an MBA with a concentration in management, and a BS in business administration.

[5]Winslow had 24 years of experience at Amtrak, including 3 years as Route Director in New York.

[6]Lombardi had 9 years of Amtrak experience and additional management experience at DHL and UPS, had a BS in business management, and was finishing his MBA.

[7]Traynor-Corey had 15 years of customer service and management experience in the airline industry, an MBA, and a BS in business administration.

After McRea offered the OBS West Region position to Traynor-Corey, he withdrew his candidacy.  Jay Fountain, a white former Route Director in Los Angeles who was retiring, agreed to stay on as acting Regional Director for the West Region until the position could be filled.  McRea then reposted the position because he and the rest of his interview panel were not comfortable selecting any of the other interviewed candidates.  After interviewing additional candidates, McRea offered the West Region position to Daniel O'Connell, who is white, on July 17, 2017

When McRea, who is black, made his hiring decisions for the four Regional Director positions, he was most concerned with finding people who would work as a team to put customers and employees first and had a good working relationship with the union.  McRea selected Popo, Lombardo, Winslow, and Traynor-Corey without first talking to Vice President Hall.  McRea made his decisions based on the candidates' interviews and recommendations from union representatives and each applicant's supervisor.  Winslow and Lombardi had good recommendations from their supervisor, Deputy General Manager Mo Savoy, and the union representatives.  Popo was recommended by Kirk, who told McRea that Popo was a diligent, always-available worker who would be an asset to his team.

Senior Director McRea said he did not select Shannon because she performed poorly in her interview, he "was not impressed" with her union

10

relationships, and she did not get a high recommendation from her supervisor, Kirk. McRea said Shannon seemed unenthused in her interview and talked more about her personal goals and metrics, which suggested to him that she was not "geared to the goal of the company as far as working together as a team," and presented metrics that were not relevant to the position. McRea was also "surprised that a person with that much time at Amtrak and working these different positions wouldn't be more forthcoming and be able to present more examples directed towards the questions."

McRea also said Kirk told him Shannon "used to be one of his best managers" but that over the last several years, she had "been confrontational" and had "not been readily available to assist," and that Kirk would choose Anella Popo, whom Kirk also supervised, over Shannon. Kirk also told McRea that, while Shannon was technically knowledgeable and very experienced, he had concerns about her integrity. Similarly, one union representative told McRea that he sometimes got "into heated discussions about how [Shannon] treated his employees," and another said that Shannon was hard to work with. McRea agreed that Lombardi was less experienced than Shannon, but he was impressed with Lombardi because he was working on his master's degree in business, he had better job performance and recommendations, and he had a "flawless" interview.

11

On May 22, 2017, McRea, in consultation with Cynthia Winslow, the new Regional Director of the East Region, and Vice President Tom Hall, offered the Senior Manager OBS position in New York to Janice "Alexis" Rogers, who is black. McRea and Winslow interviewed all the candidates and rated both Alexis Rogers and another employee (not Shannon) very highly and could not agree on which one to hire for the Senior Manager position in New York. Winslow said she was pushing for another employee who had worked for her in the past. Winslow gave Shannon a low score because she did not perform well in her interview and seemed "beaten down." After seeking input from Hall, McRea ultimately picked Rogers because she had more day-to-day experience than the other employee with the northeast corridor and "the Acela couplets, which is a big part of our operation."

After posting the Senior Manager OBS position in Miami, McRea decided it should be moved to Lorton, Virginia and reposted the position. Shannon did not apply for the reposted position in Lorton. On June 12, 2017, McRea, in consultation with Anella Popo, chose Bruce Oglesby, who is black, for the Senior Manager position in Lorton. McRea said he and Popo agreed that Bruce Oglesby was the best candidate of the five interviewed, none of whom was Shannon.

**J.    Shannon's Applications for Non-OBS Positions**

Shannon also applied for non-OBS positions, including as Senior Crew Manager in Wilmington, Delaware, as Manager of Operation Red Block, as District Station Manager in Miami, and as Superintendent in Miami.  Amtrak employees other than McRea and Hall made these hiring decisions, and again, Shannon was not selected for any of these positions.

Specifically, Shannon applied and interviewed for the Senior Crew Manager position in April 2017.  The hiring manager, Thomas Chawluk, offered the position to Elaine Platt-Hall, who is white, on April 24, 2017.  Chawluk selected Platt-Hall, an Amtrak Lead Crew Management Specialist based in Wilmington, because of her 16 years of experience in crew management, her fresh working knowledge of the collective bargaining agreement, and her good relationships with the OBS team and union officers.  In his justification for hiring Platt-Hall, Chawluk stated, among other things, that she "had accepted [his] mentoring over the past few years and understands the importance of adhering to Amtrak's values and core competencies."

Also in April 2017, Shannon applied for the Superintendent position, and she interviewed for that position on May 4, 2017.  Thomas Kirk, Shannon's former supervisor, was the hiring manager for the Superintendent position, and offered that position to Michael Jerew, who is white, on May 12, 2017.  Kirk chose Jerew

13

because he "consistently demonstrated the leadership behaviors embodied in Amtrak's Values and Core Competencies," and he had "substantial work and leadership experience in station operations."[8] Kirk also said that Jerew had "demonstrated his willingness to learn and take on new responsibilities" while working as Assistant Superintendent of Operations. Kirk agreed that both Jerew and Shannon had significant experience and that "it came down to" Kirk's concerns "with the integrity issue" of whether he trusted Shannon and also her numerous statements to Kirk that "she was not interested in a position at a senior level anymore."

Later, Jerew, as the new Superintendent in Miami, was responsible for hiring for the open District Station Manager position. Shannon applied for that position, but she was not selected to be interviewed. After a June 19, 2017 interview, Jerew hired Daniele Simkunas, who is white, and who was then the Assistant Superintendent Operations for the Tri-Rail. Jerew selected Simkunas because of her "qualifications and experience, including her ability to manage union contracts" and because he "received position feedback from Tri-Rail management" about her ability to manage employees.

---

[8]Jerew had worked at Amtrak since 1984 and had 20 years of management experience, including as a Manager of Station Operations and District Manager of Station Operations and as Assistant Superintendent of Road Operations.

14

Jerew had worked with Shannon at Amtrak for 12 years. While Jerew originally had a good opinion of Shannon, he believed she changed in 2013, at which time she began gossiping and complaining about their supervisor, Kirk. Jerew said he did not consider Shannon to be "a viable candidate" for the District Station Manager position based on his "professional interactions with [her]" and his "knowledge of the reputation [she] had developed as an abusive manager to some employees and her display of preferential treatment to others." Jerew also learned from Kirk that he had concerns about Shannon's integrity, including that she had allowed her employees to listen in on confidential telephone calls with management without authorization. Kirk approved Jerew's selection of Simkunas and said he would not have approved the selection of Shannon because of his concerns about her.

On April 18, 2017, Shannon interviewed for the Manager of Operations Red Block. The Red Block Manager was responsible for designing and implementing drug and alcohol prevention programs for the workplace. Chian Gavin, the hiring manager, offered that Red Block Manager position to Juné Rogers, who is black, on May 5, 2017. Rogers had a Masters in Public Health and prior experience in alcohol and drug prevention in the workplace.

15

**K.      Shannon's EEO Helpline Complaint**

On April 27, 2017, less than a week after McRea made offers for the four

OBS Senior Director positions, Shannon called Amtrak's helpline and complained

to Amtrak's internal Equal Employment Opportunity ("EEO") officials that Kirk,

Hall, and Murphy were not selecting her for positions, in part, on the basis of her

race and her medical condition.  An Amtrak EEO Investigator, Shzrae Mian, began

an investigation and conducted phone interviews with Shannon, Kirk and McRea

on May 2, 2017.  Investigator Mian warned Kirk and McRea that Shannon could

not be treated unfairly or retaliated against because of her EEO complaint.  Mian

was unable to complete her investigation, however, because Shannon obtained

legal representation and advised Mian that she had filed an external complaint.  At

that point, Mian closed the file pursuant to Amtrak's standard policy.

**L.      Shannon's Termination and Final FMLA Leave Request**

On May 24, 2017, Amtrak sent Shannon a formal termination letter, which

stated that because her Route Director position was eliminated, she was separated

from employment with Amtrak effective at the close of business on June 8, 2017.

On June 7, 2017, Shannon emailed Amtrak a request for FMLA leave and included

documentation from her doctor stating that Shannon was unable to work due to

tachycardia, elevated blood pressure, anxiety, and work-related insomnia and

16

depression.  On June 23, 2017, Amtrak denied Shannon's FMLA request because she was no longer employed with the company.

## II.  DISTRICT COURT PROCEEDINGS

### A.    Shannon's Complaint

Shannon filed this action alleging that Amtrak: (1) discriminated against her based on her race, in violation of § 1981; (2) retaliated against her for engaging in protected activity, in violation of § 1981; (3) interfered with her FMLA rights when it terminated her employment despite her June 7, 2017 request for FMLA leave; and (4) retaliated against her for taking FMLA leave.  Shannon's complaint is in many ways a shot-gun pleading and not a model of clarity.  Notably though, with respect to her § 1981 race discrimination claim, Shannon alleged, among other things, that race was a "substantially motivating factor in her termination." Shannon's complaint did not assert a claim of race discrimination or retaliation under Title VII.

### B.    District Court's Summary Judgment Order

Following discovery, Amtrak moved for summary judgment on all of Shannon's claims.[9]   Shannon opposed Amtrak's summary judgment motion.  The

---

[9]Shannon also filed her own motion for partial summary judgment on her FMLA interference claim, which Amtrak opposed, and the district court denied.  On appeal, Shannon does not challenge the district court's denial of her motion for partial summary judgment, and we do not address it further.

17

district court granted summary judgment to Amtrak on all of Shannon's claims. As the district court noted, Shannon's response brief was entirely devoid of record citations supporting her factual assertions, except four instances where she cited Amtrak's statement of undisputed facts to "rebut" Amtrak's claims.[10]

As a preliminary matter, the district court concluded that Shannon had violated Federal Rule of Civil Procedure 56(c) by failing to support the factual assertions in her response brief with citations to the record.  See Fed. R. Civ. P. 56(c)(1)(A) & (3) (requiring a party to support the assertion of a disputed fact with a citation to the "particular parts of materials in the record" and providing that "[t]he court need consider only the cited materials"); see also Fed. R. Civ. P. 56(e)(2) (permitting the court to consider undisputed a fact that is not properly addressed by an opposing party).  The district court noted that many of Shannon's factual assertions in her response brief could not be found in either party's statement of facts, and some appeared to be "categorically false."  Stressing that it had no obligation to dig through the record, which consisted of more than 3,000 pages, the district court declined to accept Shannon's factual assertions that "d[id] not appear with record citations in one of the statements of facts."[11]

---

[10]While a footnote in Shannon's response brief stated she was incorporating two separately-filed statements of facts, the response brief itself still did not include the necessary record cites.

[11]Shannon has abandoned any challenge to the district court's decision to disregard her factual assertions in opposition to Amtrak's summary judgment motion that lacked record

As for the merits, the district court first noted that Shannon's § 1981 race discrimination claim involved two types of employment decisions—(1) the elimination of her Route Director position as part of the January 2017 reorganization; and (2) the failure to hire Shannon for other Amtrak positions after the reorganization. As to the former, the district court applied the test in Barnes v. Southwest Forest Industries, Inc., 814 F.2d 607, 609 (11th Cir. 1987), applicable to reductions in force. In doing so, the district court concluded that Shannon had not met the third prong of a prima facie case by presenting evidence to allow the factfinder to reasonably conclude that Amtrak's decision to eliminate the Route Director position was motivated by Shannon's race. Shannon does not challenge that ruling on appeal.

As to Amtrak's decisions not to hire Shannon for other positions, the district court applied the McDonnell Douglas[12] burden-shifting framework.[13] The district court concluded that Shannon had not made out a prima facie case of race

---

citations, as she failed to make more than a passing reference to this issue on appeal. See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681–82 (11th Cir. 2014). Therefore, the facts recounted above are those the district court relied upon in considering Amtrak's motion for summary judgment.

[12]McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).

[13]The district court declined to apply the mixed-motive framework in Quigg v. Thomas County School District, 814 F.3d 1227 (11th Cir. 2016), stating that Shannon's position in her complaint, pre-trial stipulation, and statement of facts had been that there was no legitimate reason for Amtrak's hiring decisions and that she could not change her theory to mixed motives for the first time in opposition to Amtrak's summary judgment motion.

discrimination as to the four positions for which a black candidate was selected (i.e., Southeast Director of OBS given to Anella Popo, the New York and Lorton Senior Manager of OBS positions given to Alexis Rogers and Bruce Ogelsby, and the Manager of Operation Red Block position given to Juné Rogers). In any event, even assuming Shannon had established a prima facie case for all of the challenged hiring decisions, the district court determined Shannon had not shown that Amtrak's legitimate, nondiscriminatory reasons for them were pretext.

As for Shannon's claim of § 1981 retaliation, the district court concluded that Shannon could not show a causal connection because most of Amtrak's hiring decisions she challenged were made before her protected activity—the April 27, 2017 complaint on Amtrak's EEO helpline. The only hiring decisions made by Kirk and McRea (the only hiring managers informed of her EEO complaint) after her April 27, 2017 EEO complaint were (a) McRea's decisions as to the Senior Manager of OBS positions in New York and Lorton, and (b) Kirk's decision as to the Superintendent position in Miami. As to those three positions, the district court concluded that Shannon could establish a causal connection based on temporal proximity, but that she could not show that Amtrak's legitimate, nondiscriminatory reasons for those three hiring decisions were pretextual.

Turning to Shannon's FMLA claims, the district court determined that Shannon had not established FMLA retaliation "simply because [she] ha[d]

20

adduced no evidence that any hiring manager other than Kirk knew that [she] took FMLA leave," and she had not shown that Kirk's reason for not hiring her for the Superintendent position in Miami in 2017 was pretextual or motivated in any way by her FMLA activities.

As for Shannon's FMLA interference claim, the district court concluded that Shannon was terminated because her Route Director position was eliminated, and there was no evidence Shannon's position was eliminated due to "anything other than business concerns." The district court also rejected Shannon's argument, made for the first time at summary judgment, that Amtrak's refusal to grant her June 7, 2017 request for FMLA leave rendered her unable to exercise her seniority rights with her union.

## III. DISCUSSION

On appeal, Shannon argues that the district court erred in granting summary judgment. We address each claim in turn.[14]

## A.    Section 1981 Race Discrimination

Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts. See

---

[14]This Court reviews de novo a grant of summary judgment, viewing the evidence and drawing all reasonable inferences in the light most favorable to the non-moving party. McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1141 (11th Cir. 2014). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

42 U.S.C. § 1981; Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 459-460, 95 S. Ct. 1716, 1720 (1975). A plaintiff may establish the employment discrimination through direct evidence or circumstantial evidence. Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010). The parties dispute whether this case is governed by the McDonnell Douglas burden-shifting framework or the mixed-motive framework in Quigg v. Thomas County School District, 814 F.3d 1227 (11th Cir. 2016). We need not resolve this question because Shannon has not shown the district court erred in granting summary judgment no matter which framework.

In order to demonstrate a prima facie case of race discrimination in the failure-to-hire context, the plaintiff must show that: (1) she is a member of a protected class; (2) who applied and was qualified for the position; (3) despite her qualifications, she was not selected; and (4) either the position was filled by a person outside the protected class or the position remained open and the employer continued to seek applicants. See Lewis v. City of Union City, 918 F.3d 1213, 1221-22 (11th Cir. 2019) (en banc); Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005); Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 843 n.11 (11th Cir. 2000) (explaining that the elements of prima facie cases of race discrimination under § 1981 and Title VII are the same).

22

If the plaintiff establishes a prima facie case, and the defendant articulates a legitimate, nondiscriminatory reason for its employment decision, the plaintiff must then show that the employer's proffered reason was actually a pretext for discrimination. Alvarez, 610 F.3d at 1264. In doing so, the plaintiff "must meet that reason head on and rebut it," and cannot prove pretext by merely recasting the employer's reason or by arguing her own business judgment over that of her employer. Id. at 1265-66 (quotation marks omitted) (explaining that the pretext inquiry considers the belief of the employer, not the employee).

Further, in the context of Title VII and § 1983 employment discrimination claims,[15] this Court has differentiated single-motive discrimination claims from mixed-motive ones:

> An employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on [race], was a motivating factor for an adverse employment action, even though other factors also motivated the action. In contrast, single-motive claims—which are also known as "pretext" claims—require a showing that bias was the true reason for the adverse action.

Quigg, 814 F.3d at 1235 (quotation marks and citations omitted).[16] The McDonnell Douglas framework "is inappropriate for evaluating mixed-motive

---

[15]Shannon did not bring any claims under Title VII or § 1983.

[16]This Court has not addressed whether Quigg's mixed-motive framework can be applied to race discrimination claims brought under § 1981. Section 1981 does not contain a provision like the one the Civil Rights Act of 1991 added to Title VII, which provides that a plaintiff can establish an unlawful employment practice by demonstrating "that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." See 42

23

claims," and instead, the plaintiff need only show that the (1) employer made an adverse employment decision against her, and (2) a protected characteristic was a motivating factor for that decision.  Id. at 1237-39.  Thus, district courts must determine whether the plaintiff has shown that her protected characteristic was a motivating factor for an adverse employment decision.  Id. at 1239.

Based on the undisputed facts considered by the district court, Shannon did not show that (1) her race was a motivating factor for any of Amtrak's employment decisions during the reorganization, or that (2) the legitimate, nondiscriminatory reasons Amtrak gave for its decisions were pretextual.

In fact, Amtrak exhibited no racial animus because all seven Route Director positions were eliminated as part of an internal reorganization initiated by its new CEO.  Hall and the human resources department decided to eliminate those Route Director positions because, in the new Passenger Experience Department, the new

---

U.S.C. 2000e-2(m); see also Mabra v. United Food & Commercial Workers Local Union No. 1996, 176 F.3d 1357, 1358 (11th Cir. 1999) (holding that "the 1991 mixed-motive amendments to Title VII do not apply to § 1981 claims"); Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 351-63, 133 S. Ct. 2517, 2528-34 (2013) (concluding Title VII's retaliation provision, 42 U.S.C. § 2000e-3(a), requires the plaintiff to show his protected activity was the "but for" cause of the adverse employment action, not that it was a motivating factor); Gross v. FBL Fin. Serv., Inc., 557 U.S. 167, 173-78, 129 S. Ct. 2343, 2349-50 (2009) (concluding under the Age Discrimination in Employment Act's statutory text, the plaintiff must prove age was the "but for" cause and that the mixed-motive, burden-shifting framework applicable to Title VII discrimination claims does not apply).

We need not resolve this § 1981-mixed-motive issue, however, because Shannon, in any event, failed to present sufficient evidence to survive summary judgment under the Quigg summary judgment framework.

positions had such different responsibilities that the Route Director positions could not be preserved.

As to the three regional OBS Director positions and the New York and Lorton Senior Manager positions, Shannon did not show that race played a role in McRae's hiring decisions.  The record shows that Shannon did not reapply to the West Director or the Lorton Senior Manager positions after they were reposted. McRea, like Shannon, was black, which, while not determinative, makes Shannon's burden more difficult.  See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1471 (11th Cir. 1991).  Three of the six applicants McRea hired as part of his new management team—Popo, Alexis Rogers, and Oglesby—were black.  Further, there is no evidence McRea ever expressed any racial animus, and instead the evidence indicates McRea selected the candidates he believed to be the most qualified with regard to their experience, union relationships, supervisor recommendations, and interviews.  Although Shannon suggests Hall may have been the ultimate decisionmaker, there is no evidence he vetoed any of McRae's choices, and McRae himself was unsure whether Hall even had to sign off on them.[17]

---

[17]On appeal, Shannon cites to the declarations of two Amtrak employees, Sydney Brickett and Donald Boyd, to support her claim that McRae told them that upper management would not allow him to hire Shannon. The district court disregarded Shannon's factual assertions relating to Brickett and Boyd, however, because she did not provide record cites to support them in her summary judgment brief. Even if we were to consider them on appeal, they show only that, after interviewing Shannon, McRae said Shannon interviewed well, but that she "must have upset

As for the non-OBS positions, Shannon did not point to any evidence that these decisionmakers harbored any racial animus or selected candidates based on race. Instead, the evidence showed that they chose the applicant they believed was the most qualified. Kirk and Jerew also explained that they did not chose Shannon, in part, because of concerns about her integrity. Although Shannon suggests these integrity concerns were not credible, she has never disputed that she engaged in the conduct Kirk found unprofessional and concerning or that Kirk told Jerew about those concerns. As for the Operation Red Block manager position, the chosen applicant, Juné Rogers, was black.

In the district court, Shannon pointed to her Route Director progressive salary plan as evidence of Amtrak's discriminatory animus. The record reflects, however, that selected employees were placed on the plan when their previous salary was outside the target market salary range. Shannon's salary jumped from $102,500 to $125,051 when she was hired as a Route Director and continued to increase over the next three years to $152,232. Further, Winslow, who was white, was also placed on a progressive salary plan for the same reason.

---

someone really up high" and that upper-management was "not going to allow him to hire her" because Hall had told him Shannon "kept up a lot of controversy." These declarations do not suggest upper management or Hall had a racial animus.

26

In sum, as to her mixed-motive theory, Shannon did not demonstrate that her race was a motivating factor in any of Amtrak's employment decisions or that the nondiscriminatory reasons Amtrak gave for its decisions were pretextual.

## B.    Section 1981 Retaliation

Both the Supreme Court and this Court have confirmed that retaliation claims under § 1981 are cognizable. See CBOCS W., Inc. v. Humphries, 553 U.S. 442, 451-52, 128 S. Ct. 1951, 1957-58 (2008); Andrews v. Lakeshore Rehab. Hosp., 140 F.3d 1405, 1411-13 (11th Cir. 1998). Section 1981 retaliation claims are analyzed under the same framework as other employment retaliation claims. Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

In order to make out a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) there is a causal connection between the protected activity and the materially adverse action. Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1181 (11th Cir. 2010). If the plaintiff does so, and the employer proffers a legitimate, nondiscriminatory reason for its actions, then the plaintiff must show that the reason given is pretextual. Id. at 1181-82.

This Court construes the causal connection element broadly, requiring a plaintiff to prove only that "the protected activity and the negative employment action are not completely unrelated." Chapter 7 Tr. v. Gate Gourmet, Inc., 683

F.3d 1249, 1260 (11th Cir. 2012) (quotation marks omitted).  To do so, a plaintiff must show that the decisionmaker was aware of the plaintiff's protected conduct at the time of the materially adverse action.  Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1278 (11th Cir. 2008).  Thus, where an employer decided to take a materially adverse action before the employee engaged in a protected expression, the two cannot be causally connected.  Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1232-33 (11th Cir. 2006).

An employer's legitimate, nondiscriminatory reason is not a pretext for prohibited conduct unless it is shown by sufficient probative evidence both that the reason is false and that the real reason is impermissible discrimination.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515-16, 113 S. Ct. 2742, 2752 (1993).  The plaintiff demonstrates this by showing that it was more likely that a discriminatory reason motivated the employer or by pointing to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the explanation.  Brooks v. Cty. Comm'n of Jefferson Cty., 446 F.3d 1160, 1163 (11th Cir. 2006).

Here, the district court did not err in granting Amtrak's summary judgment motion on Shannon's § 1981 retaliation claim.  The district court correctly concluded that Shannon established a prima facie case only as to the hiring decisions made by Kirk and McRae after May 2, 2017, when Amtrak's EEO Investigator Mian made them aware of Shannon's EEO complaint.  There is no

28

evidence in the record that any of the other decisionmakers—Chawluk, Gavin, or Jerew—ever knew about Shannon's internal EEO complaint, and McRae extended offers to Popo, Winslow, and Lombardi prior to May 2, 2017.  Shannon did not reapply for the Lorton Senior Manager or the West Director positions when they were reposted, so she cannot show that she suffered a materially adverse action with respect to those two positions filled by McRae after May 2, 2017.

That leaves only the Superintendent position in Miami, for which Kirk selected Michael Jerew on May 12, 2017—which was after the April 27 complaint. Kirk hired Jerew because he had consistently demonstrated leadership behaviors that embodied Amtrak's values and core competencies, had twenty years of work and leadership experience in station operations, and he had demonstrated a willingness to learn new things and take on new responsibilities.  In contrast, Kirk was concerned about whether Shannon's conduct embodied Amtrak's values and core competencies because she had acted unethically by letting employees listen in on confidential phone calls and had obtained a confidential draft organizational chart.

While Shannon argues that the close temporal proximity between her EEO complaint and Kirk's decision to hire Jerew (ten days) establishes pretext, she does not deny that she engaged in the behavior Kirk found unethical, and she did not show any implausibilities or weaknesses in Kirk's reasons for selecting Jerew over

her.  Accordingly, the district court properly concluded Shannon had not shown pretext for retaliation with respect to the Superintendent position in Miami.

## C.    FMLA Claims

Under the FMLA, eligible employees are entitled to take unpaid leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of [her] position."  29 U.S.C. § 2612(a)(1)(D).  The FMLA guarantees an eligible employee the right to be restored to the position she held when her leave commenced or to an equivalent position.  Id. § 2614(a)(1)(A)-(B).  To enforce these rights, the FMLA creates two types of claims: interference claims, which assert an interference with a substantive right under the act, see 29 U.S.C. § 2615(a)(1), and retaliation claims, which assert that the employer discriminated because of the employee engaging in activity protected by the Act, see 29 U.S.C. § 2615(a)(1) & (2).  Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1206 (11th Cir. 2001).

### 1.    FMLA Retaliation

Absent direct evidence of a defendant's retaliatory intent, a plaintiff's FMLA retaliation claim is evaluated under the McDonnell Douglas framework. Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1243 (11th Cir. 2010).  A plaintiff must therefore establish a prima facie case by demonstrating: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment

30

decision; and (3) the decision was causally related to the protected activity.  Id. Thus, if a plaintiff establishes a prima facie case, and the defendant articulates a legitimate, nondiscriminatory reason for an adverse action, the plaintiff must show that its purported reason was a pretext for discrimination.  Id. at 1243-44.

Here, the district court did not err in granting summary judgment on Shannon's FMLA retaliation claim.  With regard to Shannon's June 2017 termination, the district court correctly concluded that she had not established the third prong, causation.  Hall, in consultation with the human resources department, eliminated the Route Director positions in order to repost them as new positions with different responsibilities in the Passenger Experience Department, and there is no evidence that Hall and the people in the human resources department who helped him make that decision in March 2017 knew about Shannon's FMLA leave.[18]  The same is true with respect to the hiring decisions made by McRae, Chawluk, Gavin, and Jerew during the 2017 reorganization, as there was no evidence that any decisionmaker other than Kirk knew about Shannon's FMLA leave.

---

[18]Shannon argues that Amtrak "showed a propensity to punish [her] for exercising her rights under the FMLA," and cites as an example her testimony that Murphy told her during a discussion about her 2015 annual review that she had "checked out" that year.  Shannon suggests Murphy's statement was an oblique reference to her FMLA leave, but Murphy explained that the fact that Shannon had applied for a lower position in 2014 clearly indicated to him that she was no longer interested in her Route Director position.

31

Although Shannon established a prima facie case of FMLA retaliation with regard to Kirk's refusal to hire her for the Superintendent position, she did not rebut his legitimate, nondiscriminatory reasons for his hiring Jerew over Shannon, and therefore failed to demonstrate pretext.

2.    FMLA Interference

To establish an FMLA interference claim, a plaintiff must show that: (1) she was entitled to a benefit under the FMLA; and (2) her employer denied her that benefit. White v. Beltram Edge Tool Supply, Inc., 789 F.3d 1188, 1191 (11th Cir. 2015). If the employee shows she was entitled to a benefit, she need only demonstrate by a preponderance of the evidence that she was denied the benefit; the employer's motives are irrelevant. Batson v. Salvation Army, 897 F.3d 1320, 1331 (11th Cir. 2018).

Where the interference claim is based on the employee's termination, however, "an employer may affirmatively defend against the claim by establishing that it would have terminated the employee regardless of her request for or use of FMLA leave." Id. Similarly, an employer is not liable for failing to reinstate an employee after she has taken FMLA leave if it can show that it refused to reinstate her for a reason unrelated to FMLA leave. Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1236 (11th Cir. 2010). Thus, in order for an employer to be held liable for

32

FMLA interference, the request for leave must have been the proximate cause of the termination.  Schaaf, 602 F.3d at 1242.

Shannon contends that she was still employed by Amtrak on June 7, 2017, when she requested additional FMLA leave and Amtrak's subsequent denial on June 23, 2017 established an interference claim.  Shannon ignores the fact that her Route Director position, along with all the others, had been eliminated back in March 2017 as part of a reorganization, and that the decision was made at that time to terminate her if she could not find another position within Amtrak.  As the district court explained, there was no evidence that this elimination of seven Route Director positions, including Shannon's, was motivated by anything other than business concerns.  Thus, Shannon has not shown that her final June 7, 2017 request for leave was the proximate cause of her termination.

**AFFIRMED.**