[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-14188

_____

TRISTAN TANNER,

Plaintiff-Appellant,

*versus*

STRYKER CORPORATION OF MICHIGAN,

Defendant- Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:21-cv-02293-VMC-TGW

_____

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

JILL PRYOR, Circuit Judge:

Tristan Tanner appeals the district court's order granting summary judgment in favor of his former employer, Stryker Corporation of Michigan, on Tanner's claims for interfering with his rights under the Family and Medical Leave Act ("FMLA") and for retaliation for his exercise of those rights. After careful review, and with the benefit of oral argument, we affirm.

## I. BACKGROUND

Because we are reviewing the district court's grant of summary judgment in Stryker's favor, we recite the facts in the light most favorable to Tanner and note where any facts are disputed. *See infra* Part II.

### A. Stryker, Tanner's employment, and Stryker's leave policies

Stryker is a medical technology company that sells products "in orthopaedics, medical and surgical, and neurotechnology and spine designed to improve patient and hospital outcomes." Doc. 33-1 at 1.[1] Tanner became a Stryker employee in 2020, after the company acquired his former employer. Tanner's position at Stryker was "Hub Material Handler II," which made him responsible for "delivering surgical equipment to hospitals and surgical centers, retrieving and inspecting equipment after use,

---

[1] "Doc." numbers are the district court's docket entries.

tracking inventory[,] and placing orders." Doc. 45 at 1-2 (internal quotation marks omitted). He was based out of Tampa, Florida.

Tanner's direct supervisor was Field Operations Manager Timothy Eckroad. Tanner's work also was overseen by HR Business Partner Laura-Ann Egidio.

Stryker's employee handbook, a copy of which Tanner received, contained an attendance policy with different rules depending on the type of employee. Stryker had three categories of employees for purposes of its attendance policy: (1) non-exempt employees with set shifts, (2) customer-facing, non-exempt employees or non-exempt employees without set shifts, and (3) exempt employees. There is some dispute about how Tanner's supervisors should have classified him for purposes of the attendance policy. It is undisputed that Tanner is not an exempt employee, but there was confusion about whether he had set shifts or a customer-facing job. Eckroad believed that Tanner's job was customer-facing. Egidio believed that Tanner was a non-exempt employee with a set shift.

According to the employee handbook, for non-exempt employees with set shifts, certain types of misconduct led to accrual of "occurrence points." Doc. 34-1 at 43. Absence from work without taking an available leave day resulted in the accrual of two points. The handbook specified disciplinary actions based on accrual of occurrence points, stating, "Accumulation of occurrence points within a rolling 12-month period will generally result in the following disciplinary actions:" a verbal warning, for one point; a

first written warning, for two points; a second written warning, for four points; and termination, for five points. *Id.* at 43–44.

Eckroad was responsible for giving appropriate warnings to Tanner under the attendance policy. Egidio was responsible for deciding whether Tanner would be terminated for violating the attendance policy.

Stryker had FMLA and parental leave policies, which were also laid out in the employee handbook. The FMLA policy provided Stryker employees with 12 weeks of unpaid leave and protection from termination during the leave period. The employee handbook stated that FMLA leave was "available to employees who need time off . . . for childbirth or adoption and for child bonding." Doc. 33-3 at 5. Stryker Leaves Specialist Courtney Linn testified that under the FMLA policy "a father's FMLA leave for the birth of his child begins on the day of his child's birth. If a father is absent prior to the birth of his child, he must use his" personal time off ("PTO") or "sick days to cover these absences." *Id.* at 2. Stryker's parental leave policy provided six weeks of paid leave upon the birth of a child. The two leave policies worked in tandem. For example, a parent who was eligible for both types of leave could layer his paid parental leave on top of his unpaid FMLA leave, and as a result he would be paid for half of his FMLA leave.

## B. Tanner's request for FMLA leave

Tanner and his former girlfriend, Amanda Shelburn, were expecting a child in the summer of 2021. In January 2021, Shelburn

moved from Tampa to Connecticut, where she planned to have the baby. Tanner initially believed the child to be due on August 1.

On June 21, 2021, Tanner contacted Linn to request paternity leave for the birth of his child. Linn confirmed that Tanner was eligible for FMLA and parental leave benefits. A few days later, on July 5, Tanner emailed Linn and Eckroad with a "formal[] . . . request for paternity leave starting the 26th of July." Doc. 34-1 at 35. He stated that his child's "anticipated arrival is the last week of July/first week of August" and announced that he would be "relocating to Connecticut for the duration of [his] requested time off." *Id.*

On July 8, Linn sent Tanner a notice that he was approved for FMLA leave and parental leave for the birth of his child. The notice outlined Tanner's "anticipated FMLA leave schedule," which ran from July 26 to October 17, 2021, and provided: "The FMLA requires that you notify us as soon as practicable if the dates of scheduled leave change, are extended, or were initially unknown." Doc. 33-3 at 8–9.

Tanner was told multiple times that his FMLA leave would not begin until his child was born. For example, on July 9, Linn explained to him in writing that Stryker's FMLA and parental leave benefits "apply once the baby arrives. Therefore if you plan on leaving early, you are required to just use a sick or vacation day." Doc. 34-1 at 38. On July 16, Linn explained to Tanner in writing, "Once the baby arrives, the leave will be effective that day and be processed as long as I have the proof of birth." *Id.*

**C. Tanner's absences before the birth of his child and eventual termination**

By July 20, Tanner knew that the child's due date was "going to be closer to August 12th" than to the first of the month. *Id.* at 12. Nevertheless, on Friday, July 30, he told Eckroad that he would be absent the following week because his daughter was expected to be born any day that week. Tanner acknowledged that (1) "HR said the paternity leave doesn't start till the actual birth so . . . I have to use my PTO/sick days till that day" and (2) he had only four days of PTO left. *Id.* at 53–54.

But Tanner did not leave for Connecticut immediately; instead, he testified, between Friday, July 30, and the following Sunday, August 8, he was "[p]lanning, packing, [and] preparing for the trip" to Connecticut. *Id.* at 22. He used his four remaining days of PTO and one day of sick leave for his absence that week.

On Sunday, August 8, Tanner left for Connecticut. Between that date and the day the child was born (11 days later, on August 19), Tanner spent his days "staying at the hotel" in Connecticut and "dr[iving] around some of the neighborhoods" to see if he could see himself relocating there sometime in the near future. *Id.* at 22. He used sick leave for August 9 through 12.[2]

---

[2] Tanner did not represent that he was sick when he took this sick leave. However, per Linn's instructions, he was permitted to use sick leave before the child's birth.

22-14188                Opinion of the Court                7

By Friday, August 13, Tanner was out of sick leave and PTO. So, when he missed work that day, he accrued two occurrence points under Stryker's attendance policy. On Monday, August 16, he emailed Linn, telling her, "I used up my PTO/sick days. Currently in Connecticut. [Shelburn] is coming up to 42 weeks [pregnant] and doctors are going to induce her on the 18th." *Id.* at 62. He asked, "What [d]o I do till then? And will my PTO [sic] only start on the 18th?" *Id.* Linn responded, for "[t]he time before your baby arrives, you will need to work with your [manager] and HR business partner to determine how you will take [time] off and use your vacation/sick time." *Id.* She told him, "Once the baby arrives, you will be able to use your FMLA/Parental leave time." *Id.* Tanner did not work on August 16, and he had no remaining leave, so he accrued another two occurrence points, bringing his total accrued points to four.

The next day, Tuesday, August 17, Tanner emailed Egidio, asking if she could "help . . . figure this out." *Id.* at 61. He asked, "Am I able to go over the PTO limit on this to avoid penalties and also to try [to] maintain my basic income this week[?]" *Id.* Egidio responded, "I will talk to [Eckroad] today. If you do not have time to cover your absence, you will accrue points to cover any time off of work. We will call you at some point to discuss. Did you get any type of leave covered?" *Id.* Tanner responded, "I'll just take points then as nothing else I can do. Not sure why the birth leave only starts the day you submit the birth certificate. Mother is in Connecticut so I had to leave Florida the week she was due and of course nothing goes to plan and she is almost 2 weeks over now."

*Id.* Tanner did not work on August 17, and he had no remaining leave, so he accrued another two occurrence points, bringing his total accrued points to six.

Although Shelburn's doctor had intended to induce labor on the following day, August 18, she went into labor naturally that day. Tanner accrued another two occurrence points that day, bringing his total to eight points. Shelburn gave birth on August 19.

Tanner notified Eckroad that the baby had arrived, and Eckroad asked him "to jump on a call the following day." *Id.* at 27. Tanner asked Eckroad if "this [is] about points," and Eckroad affirmed that it was. *Id.* at 28. Tanner believed he was going to get a warning. Also that day, he emailed Linn a photo of the baby and said, "My manager text[ed] me that I'm already at 8 points. So not sure what to do at this point." *Id.* at 63–64. Linn responded, "If your baby was born today, that means your FMLA/parental leave kicks in and therefore you are job protected." *Id.* at 63.

Although it is undisputed that Tanner had notice that he had been accruing occurrence points and that his manager wished to speak with him about the points he had accrued, he was not given an oral or written warning pursuant to the attendance policy. Stryker Manager Norma Barber, who was responsible for creating Stryker's leaves-of-absence policies, testified that she believed Tanner was entitled to "fair warning" that his job was in peril. Doc. 34-5 at 17.

The call on August 20 was attended by Tanner, Eckroad, and Egidio. Only Egidio spoke. Tanner testified that she said,

"Congratulations on the birth of your child," and "Effective today, . . . you're no longer with Stryker," or "You're terminated from your position." Doc. 34-1 at 27. Egidio told Tanner "that his employment was terminated due to his unexcused absences." Doc. 33-1 at 3; *see* Doc. 34-1 at 27 (Tanner acknowledging that he thought Egidio "might have touched on unexcused absence."). Egidio testified that she did not make any decisions about Tanner's employment, including the decision to terminate him, based on his request for or use of FMLA leave.

### D.  Tanner's FMLA lawsuit

Tanner sued Stryker for interference with FMLA rights (Count 1) and FMLA retaliation (Count 2). At the close of discovery, Stryker moved for summary judgment on both counts. The district court granted Stryker's motion. The court first explained that Tanner was not entitled to take FMLA leave for his absences before his child's birth. "By outlining several situations in which employees are entitled to leave prior to the birth of a child, [like an exception for a pregnant parent whose 'condition makes her unable to work,' 29 C.F.R. § 825.120(a)(4),] Congress excluded the possibility that the FMLA entitles employees to leave prior to the birth in other circumstances." Doc. 45 at 14. And "Tanner's case does not fit within any of the circumstances Congress considered worthy of FMLA leave prior to the birth of a child." *Id.* at 15.[3] Recognizing that "Tanner faced a difficult situation in trying to

[3] Although the district court attributed these exceptions to Congress, they appear instead in regulations promulgated by the Department of Labor.

predict when to begin his leave," the court concluded that he nonetheless "was not entitled to take FMLA leave prior to the birth." *Id.* Thus, the court found, as a matter of law Tanner's FMLA leave "did not begin until August 19, 2021." *Id.*

Given this conclusion, the court rejected Tanner's retaliation and interference claims. As to FMLA retaliation, the court explained that Tanner had no direct evidence of retaliation because he was not entitled to take or was not on FMLA leave when the termination decision was made. Turning to circumstantial evidence of retaliation, the district court concluded that Tanner had made out a prima facie case of retaliation—he had engaged in protected activity, suffered an adverse employment action, and had evidence of causation because he was terminated a day after he began his FMLA leave. But, the court determined, Stryker had "produced legitimate, non-discriminatory reasons" for terminating Tanner (his accrual of eight occurrence points), and Tanner had "not shown a genuine issue of material fact regarding pretext." *Id.* at 18.

As to interference, the district court concluded that Stryker had "established its affirmative 'same decision' defense." *Id.* at 26. That is, "Stryker could have terminated Mr. Tanner for accruing eight occurrence points due to repeated unexcused absences, regardless of whether he was about to begin FMLA leave." *Id.* at 27.

This is Tanner's appeal.

## II. STANDARD OF REVIEW

"We review the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court." *Batson v. Salvation Army*, 897 F.3d 1320, 1325 (11th Cir. 2018). "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* at 1326 (quoting Fed. R. Civ. P. 56(a)). We must draw all reasonable inferences in favor of the non-movant. *Id.* However, "a mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004).

## III. DISCUSSION

The FMLA provides eligible employees with 12 weeks of (typically unpaid) "leave during any 12-month period . . . [b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(A). The FMLA protects an employee's job while he is on leave by establishing his right to be restored to the position he held when his leave began (or an equivalent position). *See id.* § 2614(a)(1)(A)–(B).

The FMLA makes it unlawful for employers "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." *Id.* § 2615(a)(1). We have recognized that the FMLA prohibits employers both from interfering with employees' rights under the FMLA (interference

claims) and from retaliating against employees for exercising their rights under the FMLA (retaliation claims). *See Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001); 29 C.F.R. § 825.220(c) (stating that the FMLA "prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights").

Tanner argues that the district court erred in concluding that he was not entitled to FMLA leave in the days before his child's birth. He asserts that the FMLA must be read to cover pre-birth leave; otherwise, its benefits would be rendered a nullity. Because he was entitled to and had invoked FMLA leave on the days for which Stryker assessed him occurrence points based on his absence from work, he argues, he has direct evidence of FMLA retaliation and interference. Alternatively, he argues that he has circumstantial evidence of both FMLA violations.

We first address whether Tanner's absences before the birth of his child fall within the FMLA's leave benefits. Because we conclude that they do not, we next analyze whether he has provided circumstantial evidence of retaliation and interference such that he can avoid summary judgment. There too, we conclude that he has not.

## A. The FMLA's coverage for Tanner's absences

According to Tanner, the "critical legal issue" in this case is whether "the FMLA provide[s] protected leave to an employee 'for the birth of a child' before the child is born." Appellant's Br. 22. The

answer to that question is a qualified "yes." It is also too broad a question for the facts at issue here. The question in this case is quite narrow: does the FMLA provide an expectant parent who is neither pregnant nor married to a pregnant spouse with pre-birth leave so that he may await the child's birth away from work? Again, it is undisputed that during the four days he was not working and for which he claims entitlement to FMLA leave, Tanner was in Connecticut waiting for the child to be born. The answer to that question, which is informed by the "yes" answer to the first, is "no."

Congress authorized the Department of Labor ("DOL") to issue regulations implementing the FMLA. 29 U.S.C. § 2654. The DOL regulations state that "[b]oth parents are entitled to FMLA leave for the birth of their child." 29 C.F.R. § 825.120(a)(1). The regulations further provide that "[b]oth parents are entitled to FMLA leave to be with the healthy newborn child (i.e., bonding time) during the 12-month period beginning on the date of birth. An employee's entitlement to FMLA leave for a birth expires at the end of the 12-month period beginning on the date of the birth." *Id.* § 825.120(a)(2).

As to the first question—whether the FMLA provides pre-birth leave—it does. "Circumstances may require that FMLA leave begin before the actual date of birth of a child." *Id.* § 825.120(a)(4). "The expectant mother is entitled to FMLA leave for incapacity due to pregnancy, [or] for prenatal care." *Id.*; *see id.* ("An expectant mother may take FMLA leave before the birth of the child for

prenatal care or if her condition makes her unable to work."). "A spouse is entitled to FMLA leave if needed to care for a pregnant spouse who is incapacitated or if needed to care for her during her prenatal care." *Id.* § 825.120(a)(5).[4]

Elsewhere in the regulations, the DOL has provided pre-birth leave for adoptive and foster parents. "Employees may take FMLA leave before the actual placement or adoption of a child if an absence from work is required for the placement for adoption or foster care to proceed." *Id.* § 825.121(a)(1). "For example, the employee may be required to attend counseling sessions, appear in court, consult with his or her attorney or the doctor(s) representing the birth parent, submit to a physical examination, or travel to another country to complete an adoption." *Id.*

Tanner argues that the FMLA covered the days he was absent from work and for which he accrued points because "those four absences were necessary if he was to be there for the birth of his daughter." Appellant's Br. 23. But Tanner's claim of entitlement to pre-birth FMLA leave does not fit within any of the exceptions enumerated in the DOL regulations. So Tanner's argument leads to the second question: whether the FMLA provided him, an expectant parent who was neither pregnant nor married to a pregnant spouse, with pre-birth leave so that he could await the child's birth in Connecticut.

---

[4] Tanner is not a spouse under this provision, and he does not argue that he should be entitled to its benefits per se.

Where a case turns on the interpretation of a statute, we begin "with the words of the statutory provision." *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000) (en banc). "In interpreting written law, our duty is to determine the ordinary public meaning of the provision at issue." *Heyman v. Cooper*, 31 F.4th 1315, 1319 (11th Cir. 2022) (internal quotation marks omitted). "The canons of construction often play a prominent role in that endeavor, serving as useful tools to discern that ordinary meeting." *Id.* (internal quotation marks omitted); *see United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1089 (11th Cir. 2018) (same). "In considering the text, we bear in mind that a provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *Hunt*, 887 F.3d at 1088 (alteration adopted) (internal quotation marks omitted). "We construe regulations in much the same way we interpret statutes, so we start with the text—and, if we find it clear, we end there as well." *Young v. Grand Canyon Univ., Inc.*, 980 F.3d 814, 818 (11th Cir. 2020) (internal quotation marks omitted).[5]

The FMLA provides leave and job protection "[b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(A). The United

---

[5] We recognize that the United States Supreme Court is poised to address the scope of agency deference in *Loper Bright Enterprises v. Raimondo*, No. 22-451. Neither party here argues that the DOL regulations are not due deference— rather, both sides contend that the regulations make their respective positions clearly correct. We therefore need not address any possible impact of *Loper Bright* on our caselaw or await a decision in that case before deciding this one.

States Supreme Court has repeatedly explained that "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.'" *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)); *see Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) (same). "In the language of law, this means that . . . [the] 'because of' test incorporates . . . but-for causation." *Bostock*, 590 U.S. at 656 (citing *Nassar*, 570 U.S. at 346).

Here, then, the FMLA's text plainly provides that "the birth of" a child triggers leave and job protection. 29 U.S.C. § 2612(a)(1)(A); *see Pereda v. Brookdale Senior Living Cmtys., Inc.*, 666 F.3d 1269, 1274 (11th Cir. 2012) ("It is axiomatic that the delivery of a child is necessary in order for FMLA leave to actually commence."). As we explained, the DOL regulations provide enumerated exceptions to this rule. Where a scheme "includes particular language in one section . . . but omits it in another section," we generally presume that the omission is intentional and purposeful. *United States v. Pate*, 84 F.4th 1196, 1202 (11th Cir. 2023) (en banc) (internal quotation marks omitted); *see Young*, 980 F.3d at 818. Here, we presume based on the regulations' express inclusion of exceptions for pre-birth leave under certain specified circumstances that other circumstances—like Tanner's—are not so excepted.

Thus, we hold that the days Tanner spent awaiting the birth of his child in Connecticut—the days for which he accrued

occurrence points for unexcused absences—were not FMLA-eligible.[6]

Tanner makes several arguments to the contrary based on the DOL's regulations, but we are unconvinced. First, he says, the regulations state that parents are entitled to FMLA leave "for the birth of the child," 29 C.F.R. § 825.120(a)(1), and the ordinary meaning of "for," as opposed to, for example, "from," or "at," suggests no temporal limitation on the leave provision. This regulation, however, "cannot be read in isolation." *Pereda*, 666 F.3d at 1274. It must be read alongside the others and the FMLA's text. *Id.*; *see Hunt*, 887 F.3d at 1089. Read in context with the FMLA's "because of" text and the enumerated exceptions for pre-birth leave, "for the birth of the child" cannot be understood to remove all temporal limitations on leave before a child's birth.

Second, Tanner argues that the regulations draw a distinction between leave for bonding time, which cannot begin until "the date of the birth," 29 C.F.R. § 825.120(a)(2), and leave "for the birth of" a child, *id.* § 825.120(a)(1), which contains no express temporal limitation. He asserts that the omission of a temporal limitation in subparagraph (a)(1) indicates that it does not have one. Third, and relatedly, Tanner argues that because

---

[6] We need not decide whether the birth of Tanner's child—and therefore his FMLA leave—began on August 18, when Shelburn went into labor, or on August 19, the day she gave birth. Even before that day, Tanner had accrued six occurrence points—one more point than would generally result in termination under Stryker's attendance policy.

§ 825.120(a)(2) covers bonding time after the child is born, subparagraph (a)(1) would entirely overlap with (a)(2) and therefore be superfluous if it did not cover time before the child was born.

We disagree. To start, Tanner's reading of the regulations is inconsistent with the text of the statute. Section 2612(a)(1) of the FMLA, for example, states that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period." 29 U.S.C. § 2612(a)(1). Section 2612(a)(2) then clarifies that "[t]he entitlement to leave" for the birth of a child or to care for a newborn child "shall expire at the end of the 12-month period beginning on the date of such birth." *Id.* § 2612(a)(2). Read in conjunction, these sections of the FMLA make clear that the 12-month period for the birth of a child starts with the birth and ends 12 months immediately thereafter.

Even under the text of the regulations, Tanner's argument fails. Again, subparagraph (a)(1) of the relevant regulation states that "[b]oth parents are entitled to FMLA leave for the birth of their child." 29 C.F.R. § 825.120(a)(1). The next subparagraph, (b)(2), provides:

> Both parents are entitled to FMLA leave to be with the healthy newborn child (i.e., bonding time) during the 12-month period beginning on the date of birth. An employee's entitlement to FMLA leave for a birth expires at the end of the 12-month period beginning on the date of the birth. If state law allows, or the employer permits, bonding leave to be taken beyond

> this period, such leave will not qualify as FMLA leave.
> . . . Under this section, both parents are entitled to
> FMLA leave even if the newborn does not have a
> serious health condition.

*Id.* § 825.120(a)(2). Tanner's argument about the temporal limitation in (a)(2) would be correct only if we construe it and (a)(1) as separate silos. But they are not. *Pereda*, 666 F.3d at 1274. Read in tandem, these two subparagraphs provide that FMLA leave is available to both parents for the birth of their child and define parameters around that leave. True, there is some overlap between the two subparagraphs. But "[l]anguage in two separate [subparagraphs] of a regulation isn't superfluous merely because it overlaps." *Young*, 980 F.3d at 820. Here, subparagraph (a)(2) contains much more information than (a)(1) does, qualifying the scope of the leave that (a)(1) generally provides.

Fourth, Tanner argues that the FMLA should be construed broadly in favor of employees and insists that the DOL regulations' express provision for pre-birth leave under specified circumstances should not be read to limit pre-birth leave under other circumstances. Although the FMLA undoubtedly was enacted "to entitle employees to take reasonable leave . . . for the birth or adoption of a child," it also was intended "to balance the demands of the workplace with the needs of families" and to "accomplish [these] purposes . . . in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(1)–(3). As we explained above, we must presume that the DOL intentionally omitted the type of pre-birth leave Tanner advocates. *Pate*, 84 F.4th at 1202; *see*

*Young*, 980 F.3d at 818. That decision is consistent with the FMLA's purpose: accommodating employees *and* employers.

Fifth, and finally, Tanner argues that reading the FMLA and its implementing regulations to exclude coverage for the days he spent waiting for his child to be born would "lead to incomprehensible and unjust results." Appellant's Br. 31. Several of the examples he provides, however, could be covered by the FMLA. He argues that under our interpretation of the FMLA, a mother's "extended labor" would not be covered. *Id.* He also argues that a pregnant woman in New York who, three days before her due date, is asked to attend a five-day conference in California, would not be permitted to invoke FMLA leave to avoid the travel. Not so: the regulations expressly provide for pre-birth leave for a person who is unable to work because of pregnancy. 29 C.F.R. § 825.120(a)(4). Both situations would be covered.

We have little doubt that some people and families who would benefit from FMLA leave are denied its benefits because its reach and scope is limited. *See, e.g.*, 29 C.F.R. § 825.104(a) (excepting from FMLA altogether almost any employer who employs fewer than 50 employees). And we are sensitive to the hardship Tanner faced in trying to guess when his child would be born and manage his remaining leave in the meantime. But, for the reasons we have explained, we reject his reading of the statute and regulations. The days he spent in Connecticut waiting for his child

to be born were not covered under FMLA.[7] Thus, he has no direct evidence that his termination was in violation of FMLA's protections.

We next address Tanner's retaliation and interference claims based on circumstantial evidence.

### B. Tanner's FMLA retaliation claim

Where an employee alleges FMLA retaliation without direct evidence of an employer's retaliatory intent, "we apply the burden shifting framework established in" *McDonnell Douglas Corp. v. Green*. *Batson*, 897 F.3d at 1328–29. "To establish a prima facie case of retaliation under [the FMLA], an employee must demonstrate (1) that she engaged in statutorily protected conduct, (2) that she suffered an adverse employment action, and (3) that a causal connection exists between the two." *Id.* at 1329. "Once the employee has established a prima facie case, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse action." *Id.* "If the employer does so, the burden shifts back to the employee to demonstrate that the employer's proffered

---

[7] Congress's decision to emphasize post-birth leave is not as harsh as it may seem at first blush. As a practical matter, Tanner had several months' warning to prepare for his child's birth, and as of July 30, Tanner had four days of PTO and five days of sick leave for pre-birth absences. However, rather than saving and using his leave for Connecticut, where Shelburn was, Tanner used his four PTO days and one sick leave day (between July 30 and August 8) to stay in Florida without working, where he packed and planned the trip. This is not to criticize Tanner, but to point out that he had almost two workweeks of leave to use for his pre-birth absences.

reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id.* (internal quotation marks omitted).

The district court concluded that Tanner had met his burden to demonstrate a prima facie case of retaliation, and we can assume that the court's conclusion was correct. *See Krupa v. Landsafe, Inc.*, 514 F.3d 1153, 1156 (11th Cir. 2008) (making assumptions in a plaintiff's favor and addressing why, even given those assumptions, summary judgment in favor of a defendant was warranted). Thus, we need only address whether Stryker articulated a nondiscriminatory reason for terminating Tanner and, if so, whether he has created a genuine issue of material fact as to pretext.

Tanner argues that Stryker has failed to articulate a nondiscriminatory reason for his termination. He asserts that he was "already under the protection of the FMLA" on August 13 through 18 "to ensure his presence at the birth" of his child and that his termination "for absences that the FMLA protected" was not legitimate. Appellant's Br. 42–43. But, as we explained, the FMLA did not cover Tanner's absences.

Alternatively, Tanner argues he established that Stryker's proffered reason for terminating him was pretextual. He points to evidence that Eckroad believed him to be in a "customer-facing" position and therefore not subject to the point-based attendance policy, Stryker's failure to provide him a warning before his

termination as contemplated by the attendance policy, and the close temporal proximity between the start of his FMLA leave and his termination.[8] None of these persuades us that Tanner has offered evidence creating a genuine issue of material fact as to pretext.

Tanner is right that Eckroad believed him to be in a customer-facing position. But that is not the whole story. Eckroad also believed that Tanner was subject to the occurrence-points attendance policy. More importantly, the evidence shows that Eckroad was not responsible for the decision to terminate Tanner for unexcused absences. That decision fell to Egidio, who believed that Tanner was subject to the policy. Tanner characterizes Egidio's belief as "implausible," but his only evidence for this purported implausibility is a single reference in an employee evaluation, which *Eckroad*—not Egidio—completed, regarding Tanner's interaction with "customers." Appellant's Br. 45–46 (citing Doc. 34-3 at 6). Tanner has produced no evidence that *Egidio* believed Tanner to be customer-facing or otherwise not subject to the attendance policy. And even if Eckroad was right and Egidio

---

[8] Tanner also argues, for the first time on appeal, that he can show pretext because of two "additional inconsistenc[ies]" in Stryker's evidence of why he was terminated. Appellant's Br. 50. First, he says, he requested and was denied the opportunity to take online training courses while waiting in Connecticut for the birth of his child so that he would not accrue further unexcused absences. Second, he says, Stryker failed to offer him discretionary personal leave to cover his otherwise unexcused absences. Because Tanner failed to raise these arguments in the district court, we do not consider them here. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

was wrong about the nature of Tanner's job, "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Damon v. Fleming Supermarkets of Fla.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999).

Tanner further argues that even if he was subject to the occurrence-points attendance policy, Stryker failed to follow the policy by issuing him no warnings for accruing occurrence points, and "an employer's deviation from its own standard procedures may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006). We see two problems with Tanner's argument. First, the attendance policy did not require warnings; rather, it stated only that warnings "generally" would be given. Doc. 34-1 at 43–44. And second, even accepting Tanner's argument that he should have been given a warning under the attendance policy, it is undisputed that Eckroad was responsible for giving warnings and Egidio was responsible for the decision to terminate him.[9] So, even if Eckroad deviated from

---

[9] Tanner suggests that this evidence is disputed. He argues that, by concluding as we do that Eckroad was responsible for discipline short of termination and Egidio was responsible for termination, the district court "engaged in an improper interpretation of competing facts." Appellant's Br. 49. The evidence he cites, however—testimony from Eckroad and Egidio about their respective managerial roles—does not create any disputed issue of fact as to who was responsible for his termination. Eckroad never suggested that he was responsible for the decision regarding Tanner's termination. In fact, he testified that he did not make the decision and that Egidio did because "[s]he

the policy, Egidio did not, and there is no evidence that Egidio worked with Eckroad on the decision to terminate Tanner. This division of responsibilities may have been a poor way of managing Tanner's employment, but it does not provide evidence of pretext. *See Damon*, 196 F.3d at 1363 n.3 ("An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." (emphasis and internal quotation marks omitted)).

Finally, Tanner asserts that the close temporal proximity between the start of his FMLA leave and his termination is evidence of pretext. "While close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1137 n.15 (11th Cir. 2020) (en banc). Without other evidence that could be coupled with the temporal proximity in this case, there is no genuine issue of material fact as to pretext. *See Young*, 358 F.3d at 860 (explaining that a party must put forth more than a mere scintilla of evidence to avoid summary judgment).

We therefore affirm the district court's grant of summary judgment in Stryker's favor on Tanner's FMLA retaliation claim.

---

was overseeing us." Doc. 34-3 at 12–13. And although Egidio testified that Eckroad was responsible for some disciplinary actions, she maintained that she was responsible for any decision regarding termination.

### C.  Tanner's FMLA interference claim

We reject Tanner's FMLA interference claim for the same reasons that we reject his retaliation claim. "To prove FMLA interference, an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA." *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1266–67 (11th Cir. 2008). "An employee need not allege that his employer intended to deny the right; the employer's motives are irrelevant." *Id.* at 1267 (internal quotation marks omitted). "Where the claim is based on an employee's termination, however, . . . an employer may affirmatively defend against the claim by establishing that it would have terminated the employee regardless of [his] request for or use of FMLA leave." *Batson*, 897 F.3d at 1331 (citing *Martin*, 543 F.3d at 1267). "At summary judgment, then, the analyses for an FMLA interference claim based on an employee's termination and an FMLA retaliation claim are essentially the same." *Id.* "[W]e ask whether the evidence, viewed in the light most favorable to the non-moving party, establishes as a matter of law that the employer would have terminated the employee regardless of [his] request for or use of FMLA leave." *Id.* Where an employee presents evidence from which a reasonable jury could conclude that his employer's proffered reasons for his termination were pretext, he "likewise raises a genuine dispute of material fact as to whether [he] would have been terminated regardless of [his] request for FMLA leave." *Id.* at 1331–32.

Here, however, Tanner has presented no evidence from which a reasonable jury could find that Stryker's reason for his

termination—his accrual of more than five occurrence points under the attendance policy before he began his FMLA leave—was pretext. So, as with his retaliation claim, summary judgment in Stryker's favor was appropriate, and we affirm.

## IV. CONCLUSION

We acknowledge the distress Tanner surely felt when he lost his job the day after his child was born. Nonetheless, he has offered no evidence from which a reasonable jury could conclude that his former employer engaged in FMLA retaliation or interference. We therefore affirm the district court's grant of summary judgment in Stryker's favor.

**AFFIRMED.**