[DO NOT PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-10387

Non-Argument Calendar

_____

GENT ROW, LLC,

Plaintiff-Counter Defendant
Counter Claimant-Appellant,

*versus*

TRUIST FINANCIAL CORPORATION,

Defendant-Counter Claimant
Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

D.C. Docket No. 9:22-cv-80684-WPD

———————————

Before JILL PRYOR, LAGOA, and WILSON, Circuit Judges.

PER CURIAM:

Appellant Gent Row, LLC, opened a commercial bank account with a bank that later became Truist Financial Corporation. On the same day that Gent Row opened the account, it received an incoming wire for more than six million dollars. The next business day, Gent Row sought to send more than two million dollars through an outgoing wire to a foreign bank account. Truist flagged the outgoing wire as a potentially fraudulent transaction. After looking into Gent Row's transactions, Truist refused to send the outgoing wire, returned the money that had been wired into Gent Row's account, and closed the account.

Gent Row sued Truist, alleging that the bank had breached the written contract governing the parties' relationship. The district court granted summary judgment to Truist, concluding that there was no breach of contract. After careful consideration, we affirm.

**I.**

Gent Row, which was founded in 2016 by Thomas Beasley, III, operates a website selling menswear from designers, as well as made-to-measure clothing. During the COVID-19 pandemic, Beasley decided to pivot Gent Row's business to selling personal protective equipment ("PPE"), such as masks and medical gowns.

Beasley's plan was for Gent Row to acquire PPE from suppliers in China and then sell the products to its customers.

In April 2020, Gent Row agreed to supply medical gowns to AMA International Group, Inc., a broker that was procuring medical gowns for the Canadian government. The terms of the agreement were set forth in four purchase orders that AMA issued on Friday, April 24, 2020. These purchase orders reflected that AMA was seeking to purchase $31 million worth of hospital gowns from Gent Row.

The purchase orders required Gent Row to deliver the gowns quickly. The first purchase order required Gent Row to deliver two million gowns to the Montreal airport by Tuesday, April 28. The second purchase order required Gent Row to deliver one million gowns to the Toronto airport by April 28. The third purchase order required Gent Row to deliver two million gowns to the Toronto airport by Friday, May 1. And the fourth purchase order required Gent Row to deliver two million gowns to the Montreal airport by Friday, May 8. Each purchase order required AMA, in turn, to pay Gent Row $4.50 per gown with half the amount due as a deposit and the remainder due upon delivery and inspection of the gowns in Canada.

On April 23, AMA attempted to wire Gent Row $6,750,000 in deposits for the first two purchase orders. Gent Row directed AMA to wire the deposit to its account with First National Bank Coastal Community ("FNBCC"). For the incoming wire, AMA listed Gent Row's account number with FNBCC but addressed the

4                        Opinion of the Court                    24-10387

wire to TR Manufacturing, Inc. Because the name of the wire recipient did not match the name on the bank account, FNBCC rejected the wire and immediately closed Gent Row's account.

The next day, April 24, Gent Row opened a commercial bank account with Truist.[1] The account was governed by a Commercial Bank Service Agreement ("CBSA").

The CBSA addressed, among other things, when the bank could close an account, return funds deposited in an account, or freeze funds deposited in an account. The CBSA gave Truist the right to "close any account with or without cause at any time." Doc. 119-1 at 7.[2] The CBSA also gave the bank "discretion" to close an account "without prior notice" if it believed that closing the account was "necessary to protect the Bank, its employees[,] or others from risk, harm[,] or loss." *Id.* The CBSA further stated that "[t]he Bank, in its reasonable discretion, may also refuse to accept a deposit or may reverse a deposit even after provisional credit has been granted without prior notice." *Id.* at 6. In addition, if Truist "believe[d]" an account was "subject to fraudulent or impermissible activity," it could "freeze all or any portion of the funds [it] deem[ed] appropriate until the dispute is resolved" or "close the account and pay any proceeds to (a) all who have claim or interest in the account; or (b) the account owner(s)." *Id.* at 13. The CBSA

---

[1] To be more precise, Gent Row opened an account with Branch Banking and Trust Company, which later merged with another bank to form Truist. For simplicity's sake, we refer to the bank as Truist.

[2] "Doc." numbers refer to the district court's docket entries.

also stated that Truist could freeze or place a hold on an account if it "in good faith[] believe[d]" that it "may suffer a loss as a result of [the accountholder's] actions." *Id.* In addition, the CBSA provided that Truist was not liable for any "loss or damage" incurred because of placing a hold on an account. *Id.*

When Beasley opened the Gent Row account, he explained to the Truist representative assisting him that he was seeking to open the account to send and receive wires in connection with Gent Row's transactions purchasing PPE from suppliers in China and selling it to purchasers in Canada. He provided Truist with copies of AMA's purchase orders.

On the same day that Gent Row opened the Truist account, AMA successfully wired $6.75 million to the account. On April 27—the next business day—Gent Row sought to wire $2.1 million to a supplier's bank account in Hong Kong. In an email, Beasley directed Truist to send the money and identified Federal International Development, Co., Ltd., as the wire recipient.

Truist did not immediately wire the funds. Instead, it requested additional information from Beasley about the transactions underlying the requested wire. In a text message, he answered that he was wiring the money in connection with a "purchase order from the country of Canada to me to manufacture non-medical garments in Lou [sic] of the high demand from this virus."[3]

---

[3] In making these representations, Beasley failed to mention that he had not received a purchase order from the Canadian government itself but instead from a broker, AMA. And although Beasley told Truist that the transaction

Doc. 109-13 at 1. Beasley also told Truist that the manufacturer of the products was "Henan Joinkona Medical Products Stock Co[]. Ltd." in Henan Province, China. *Id.* at 2. Notably, this entity was not the wire recipient.

Based on its investigation of the transaction, Truist declined to process the outgoing wire to Federal International Development. It had directed its employees to look out for fraudulent schemes. It advised employees that suspicious activities included customers sending emails saying that they needed "to quickly send money abroad to foreign suppliers for the purchase of on-demand medical supplies for sale to be used to prevent/protect against the Coronavirus, i.e.[,] medical masks, gloves, disinfectant, etc." Doc. 112-1 at 51.

Based on its investigation, on April 29, Truist returned the funds received via wire from AMA. On that same day, Truist also closed Gent Row's account. Because Gent Row never sent any money to Federal International Development, no gowns were ever manufactured or delivered to Canada. As a result, Gent Row did not fulfill AMA's purchase orders.

Gent Row sued Truist in Florida state court. Truist removed the action to federal court based on diversity jurisdiction. In the operative complaint, Gent Row alleged that Truist breached the

---

was for non-medical gowns, he has since admitted that the purchase orders were for medical gowns.

CBSA in its handling of the wires. Gent Row asserted that Truist's actions caused it to lose the business relationship with AMA.

The district court granted summary judgment to Truist, concluding that there was no evidence that Truist had breached any provision in the CBSA. It explained that Truist had investigated Gent Row's transactions and determined that they "showed indications of potentially fraudulent activity." Doc. 149 at 11. The court concluded that Truist's actions regarding the Gent Row account—refusing to process the outgoing wire to Federal International Development, freezing the proceeds of the wire from AMA, returning those funds to AMA, and closing the account—were authorized by the CBSA.

This is Gent Row's appeal.

## II.

"We review the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court." *Tanner v. Stryker Corp. of Mich.*, 104 F.4th 1278, 1284 (11th Cir. 2024) (internal quotation marks omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the grant of summary judgment, "[w]e must draw all reasonable inferences in favor of the non-movant." *Tanner*, 104 F.4th at 1284.

### III.

Gent Row argues that the district court erred when it granted summary judgment to Truist on its breach of contract claim. We disagree.

The parties agree that Florida law governs Gent Row's breach of contract claim.[4] To prevail on a breach of contract claim under Florida law, a plaintiff must show "(1) the existence of a contract; (2) a breach of the contract; and (3) causation of damages as a result of the breach." *Cole v. Plantation Palms Homeowners Ass'n, Inc.*, 371 So. 3d 413, 415 n.2 (Fla. Dist. Ct. App. 2023).

To answer whether there was a breach, we must review Truist's obligations under the CBSA. In interpreting this contract, we must "give effect to the plain and ordinary meaning of its terms." *Golf Scoring Sys. Unlimited, Inc. v. Remedio*, 877 So. 2d 827, 829 (Fla. Dist. Ct. App. 2004). When a contract gives a party discretion in performing its obligations, the party still must "act in good

---

[4] In applying Florida law in this case, we look to decisions of the Florida Supreme Court. *See Silverstein v. Gwinnett Hosp. Auth.*, 861 F.2d 1560, 1569 (11th Cir. 1988) ("It is well settled that federal courts are bound by the interpretation of a state [law] by state courts."). In the absence of a decision from the Florida Supreme Court, we look to the decisions of Florida's "intermediate appellate courts unless there is some persuasive indication that the highest court of the state would decide the issue differently." *McMahan v. Toto*, 311 F.3d 1077, 1080 (11th Cir. 2002). As we have explained, this approach is "particularly appropriate in Florida" because the Florida Supreme Court "has held that 'the decisions of the district courts of appeal represent the law of Florida unless and until they are overruled.'" *Id.* (alterations adopted) (quoting *Pardo v. State*, 596 So. 2d 665, 666 (Fla. 1992)).

faith." *Share v. Broken Sound Club, Inc.*, 312 So. 3d 962, 970 (Fla. Dist. Ct. App. 2021); *see Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097 (Fla. Dist. Ct. App. 1999) (recognizing that when a contract vests one party with "a degree of discretion in performance," there is in general "an implied obligation of good faith to observe reasonable limits in exercising that discretion" (internal quotation marks omitted)). Florida courts have recognized that a party who is granted discretion under a contract breaches the implied obligation of good faith only when "no reasonable party in the same position would have made the same discretionary decision." *Share*, 312 So. 3d at 970; *see Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001) (applying same standard in case arising under Florida law).

The CBSA gave Truist discretion to make certain decisions regarding commercial bank accounts. Truist was permitted "in its reasonable discretion" to refuse to accept or to reverse any deposit. Doc. 119-1 at 6. And if Truist "believe[d]" that an account was "subject to fraudulent or impermissible activity," it had "discretion" to "freeze all or any portion of the funds [it] deem[ed] appropriate until the dispute is resolved" or to "close the account." *Id.* at 13. Furthermore, the CBSA gave Truist discretion to "close any account with or without cause at any time." *Id.* at 7. Truist was permitted to close an account without advance notice if it believed that closing the account was "necessary to protect the Bank, its employees[,] or others from risk, harm[,] or loss." *Id.*

After reviewing the relevant contract provisions and the record, we agree with the district court that there was no breach of contract here. When exercising its discretion under the provisions identified above, Truist had a duty to act in good faith. *See Share*, 312 So. 3d at 970. Truist reasonably exercised the broad discretion the CBSA afforded it when it declined to send Gent Row's outgoing wire to Federal International Development, froze the funds AMA had wired to Gent Row, returned those funds to AMA, and closed Gent Row's account.[5]

The undisputed evidence shows that Gent Row opened the account with Truist on Friday, April 24 and on the same day received a wire from AMA for more than $6 million. The next business day, Gent Row sought to send more than $2 million through a wire transfer to Federal International Development, an entity in Hong Kong. When Truist followed up with Beasley and asked about the purpose of the wire, he stated that the funds were being sent in connection with a transaction to purchase for Canada "non-medical garments in Lou [sic] of the high demand from this virus." Doc. 109-13 at 1. He then identified the manufacturer of the gowns as "Henan Joinkona Medical Products Stock Co[]. Ltd." *Id.* at 2. From these communications, Truist learned that the manufacturer of the PPE was not the same as the wire recipient. On top of that,

---

[5] In its reply brief, Gent Row asserts that Truist "did not . . . close the account." Reply Br. 5. But Gent Row admitted in the district court that Truist closed the account on April 29—the same day that Truist returned to AMA the money it had wired.

Truist was aware of fraudulent schemes involving accountholders seeking "to quickly send money abroad to foreign suppliers for the purchase of on-demand medical supplies . . . to be used to prevent/protect against the Coronavirus, i.e. medical masks, gloves, disinfectant, etc." Doc. 112-1 at 51. Given all of this, Truist acted reasonably when it refused to send the outgoing wire, froze the funds wired by AMA, returned those funds to AMA, and closed Gent Row's account.

Gent Row argues that Truist's guidance to its employees about COVID-related scams is irrelevant because Truist was warning its employees about phone scams and the "issue of phone scams had nothing to do with Gent Row's account, the incoming wire, or the request for an outgoing wire" Appellant's Br. 8. Although Truist's guidance did warn employees to be on the lookout for phone scams, the guidance about fraudulent requests for wire transfers related to COVID-19 supplies directed employees to "[p]ay special attention to *email communication[s]*" requesting wires. Doc. 112-1 at 51 (emphasis added). And the record here shows that Beasley sent an email to a Truist representative requesting the wire to Federal International Development. We are unpersuaded by Gent Row's argument that Truist's guidance was irrelevant.

Gent Row nevertheless says that Truist breached the implied covenant of good faith when it refused to send the outgoing wire and froze the funds received from AMA's incoming wire. Although Truist asserted that it took these steps only after it performed an internal investigation about the transactions, Gent Row

argues that there's no evidence of the bank performing an internal investigation. The record roundly refutes Gent Row's assertion. At the summary judgment stage, Truist submitted a declaration from an executive who testified, among other things, that the company conducted an "internal investigation" into Gent Row's wire transactions. *Id.* at 4. Consistent with this testimony, the record reflects that after Gent Row requested the outgoing wire, Truist performed an investigation by, among other things, asking Beasley follow-up questions about the transactions. Given this evidence, the burden at summary judgment shifted to Gent Row to show that there was a disputed issue of fact about whether Truist performed an internal investigation by coming forward with evidence showing that no investigation occurred. *See* Fed. R. Civ. P. 56(c)(1)(A). Because Gent Row failed to submit such evidence, the district court did not err at the summary judgment stage when it determined that the undisputed evidence showed that Truist performed an internal investigation.

Gent Row also challenges the adequacy of Truist's internal investigation into fraud. It says that the bank should have given Beasley an opportunity "to explain his business" and provide additional information about the wire transfers before the bank refused to send the outgoing wire, froze funds from the wire sent by AMA, or returned money to AMA. Appellant's Br. 18–19. But the CBSA gave Truist broad discretion if it believed that the account was subject to fraudulent or impermissible activity, it might suffer a loss because of Gent Row's actions, or closing the account was necessary to protect the bank or others from harm. Certainly, Truist

could have followed up with Beasley further and accepted his explanation for why Gent Row's transactions were legitimate. But because we cannot say that no reasonable party in Truist's position would have made the same decisions it did regarding Gent Row's account, we conclude that Truist did not breach the implied covenant of good faith. *See Share*, 312 So. 3d at 970.

## IV.

For the above reasons, we affirm the district court.

**AFFIRMED.**